The **UNITED STATES JAYCEES, a non-profit Missouri corporation, on behalf of itself and its qualified members, Appellant,**

v.

**Marilyn E. McCLURE, Commissioner, Minnesota Department of Human Rights; Warren Spannaus, Attorney General of the State of Minnesota; and George A. Beck, Hearing Examiner of the State of Minnesota, Appellees.**

No. 82–1493.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1982.

Decided June 7, 1983.

Rehearing and Rehearing En Banc Denied Aug. 1, 1983.

Dissenting Opinion Aug. 1, 1983.

**ARNOLD, Circuit Judge.**

The United States Jaycees, a young men's civic and service organization, does not admit women to full membership. A Minnesota statute, as amended in 1972, forbids discrimination on the basis of sex in "places of public accommodation." Minn. Stat.Ann. §§ 363.01 subd. 18, 363.03 subd. 3. The Supreme Court of Minnesota has interpreted this phrase to include the Jaycees, and the Minnesota Department of Human Rights has ordered the Jaycees to admit women to its local chapters in Minnesota. In this suit brought by the Jaycees, we are asked to declare the statute, as so applied and interpreted, unconstitutional, as in violation of the rights of speech, petition, assembly, and association guaranteed by the First and Fourteenth Amendments.

We hold that the Jaycees, a substantial part of whose activities involve the expression of social and political beliefs and the advocacy of legislation and constitutional change, does have a right of association protected by the First Amendment. In our opinion, the interest of the state, in the circumstances of this case, is not strong enough to deserve the label "compelling," so as to override this right. In addition, the state law is unconstitutionally vague. The Jaycees is therefore entitled to an injunction restraining the state from efforts to prohibit its membership policy under state law as presently written. This is not to say that no state law could be written to redress this kind of nongovernmental discrimination. Still less do we intend to express our own view of what the Jaycees is doing. But if, in the phrase of Justice Holmes, the First Amendment protects "the thought that we hate," it must also, on occasion, protect the association of which we disapprove. The First Amendment guarantees freedom of choice in a certain area. That freedom must, on occasion, include the freedom to choose what the majority believes is wrong. For reasons to be described, we think this is one of those occasions.[1]

Warren Spannaus, Atty. Gen., State of Minn., Richard L. Varco, Jr., Sp. Asst. Atty. Gen., Saint Paul, Minn., for appellees McClure, Spannaus, and Beck.

Clay R. Moore, Mackall, Crounse & Moore, Minneapolis, Minn., Carl D. Hall, Jr., Tulsa, Okl., for appellant The United States Jaycees.

NOW Legal Defense and Education Fund, Inc., Phyllis N. Segal, Judith I. Avner, New York City, Kramer, Levin, Nessen, Kamin & Soll, Charlotte M. Fischman, Miriam R. Best, Edward H. Rosenthal, New York City, for the National Organization for Women, Minnesota State Chapter, as amicus curiae.

Robert A. Yothers, Seattle, Wash., for amicus curiae.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

---

1. The Jaycees' refusal to admit women has given rise to several other court or agency opinions. See *Junior Chamber of Commerce of Kansas City, Missouri v. Missouri State Junior Chamber of Commerce,* 508 F.2d 1031 (8th Cir. 1975) (receipt of federal funds (a practice since discontinued) does not make Jaycees a governmental actor for purposes of the Fifth Amendment); *New York City Jaycees, Inc. v. The United States Jaycees, Inc.,* 512 F.2d 856 (2d

## I.

The United States Jaycees is a nonprofit corporation organized under the laws of Missouri. Its national headquarters is in Tulsa, Oklahoma. It is a private (in the sense of nongovernmental) membership organization. It receives no federal or state funds, though it is exempt from federal income taxation under Section 501 of the Internal Revenue Code. At the time of the trial before the District Court in August of 1981, the Jaycees had about 295,000 regular members in 7400 local chapters. Article 2 of the Jaycees' By-Laws sets out the organization's purpose:

A. This Corporation shall be a non-profit Corporation, organized for such educational and charitable purposes as will promote and foster the growth and development of young men's civic organizations in the United States, designed to inculcate in the individual membership of such organization a spirit of genuine Americanism and civic interest, and as a supplementary education institution to provide them with opportunity for personal development and achievement and an avenue for intelligent participation by young men in the affairs of their community, state and nation, and to develop true friendship and understanding among young men of all nations.

B. Towards these ends, this Corporation shall adopt the following as its Creed: We believe

That faith in God gives meaning and purpose to human life;

That the brotherhood of man transcends the sovereignty of nations;

That economic justice can best be won by free men through free enterprise;

That government should be of laws rather than of men;

That earth's great treasure lies in human personality;

And that service to humanity is the best work of life.

This case centers around the Jaycees' requirements for membership. Article 4 of the By-Laws creates seven classes of membership, including Individual Members, also known as regular members, Associate Individual Members, and Local Organization Members, that is, local chapters. Between 1975 and 1978 women were permitted to become regular members in a few states [2] as part of a "pilot program," but the experiment was discontinued in 1978. As matters now stand, Article 4–2 of the By-Laws establishes the following requirements for regular membership:

Young men between the ages of eighteen (18) and thirty-five (35), inclusive, of Local Organization Members in good standing in this Corporation shall be considered Individual Members of this Corporation (unless the ages for membership shall have been changed by the State Organization Member as hereinabove permitted by By-Law 4–4.A.).[3] Such Individual Members shall be qualified by, and represented through, the Local Organiza-

Cir.1975) (same); *Junior Chamber of Commerce of Rochester, Inc. v. United States Jaycees*, 495 F.2d 883 (10th Cir.), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974) (same); *United States Jaycees v. Bloomfield*, 434 A.2d 1379 (D.C.App.1981) (Jaycees is not a "place of public accommodation" within the meaning of the D.C. Human Rights Act of 1977, D.C.Code § 6–2241(a)(1) (Supp.1978)); *Richardet v. Alaska Jaycees,* No. 3AN–79–424 CIV (Super.Ct. 3d Jud.Dist. of Alaska Sept. 15, 1980) (Jaycees is a place at which amusement or business services or commodities are offered to the public within the meaning of the Alaska public-accommodations law, Alaska Stat. §§ 18.80.230(1), .300(7)); *Fletcher v. U.S. Jaycees,* No. 78–BPA–0058–0071 (Mass. Comm'n

Against Discrimination Jan. 27, 1981) (Jaycees is a place of public accommodation within the meaning of Mass.Gen.Laws Ann. ch. 272, §§ 92A, 98).

The question has also been vigorously debated within the organization. On three occasions a resolution favoring the admission of women has been defeated, but each time a larger minority has voted for it.

2. The Minnesota State Jaycees voted not to participate in the pilot program.

3. Under By-Law Art. 4–4A a State Organization may restrict the minimum age of regular members to an age more than 18 but not more than 21.

tion Member so long as he shall pay the dues to the Local Organization Member specified in its by-laws, constitution or articles of incorporation (which shall include a subscription to FUTURE magazine).

Associate Individual Members may be businesses, associations, groups, or individuals, such as men over 35 or women, who are not eligible for regular membership. Associate members may not vote or hold office, but they may otherwise participate fully in Jaycee activities, except that they may not receive certain national awards. Local chapters must be "young men's organization[s] of good repute ... organized for purposes similar to and consistent with those of this Corporation ...." By-Laws Art. 4–4A. The constitution, certificate of incorporation, and by-laws of local chapters must be consistent with and subject to the national and State by-laws, *id.* Art. 4–4C2; local chapters that change their rules so as to be inconsistent with the national by-laws may have their charters revoked, *id.* Art. 4–4F; and local chapters who lose their charter are forbidden to continue using the name "Jaycees," *id.* Art. 4–4I.

In 1974 the Minneapolis and St. Paul, Minnesota, local chapters began accepting women as full-fledged individual members. The U.S. Jaycees threatened to revoke the charters of these local organizations because of this infraction of its rules. Members of the Minneapolis and St. Paul chapters then, late in 1978, filed complaints with the Minnesota Department of Human Rights, a state agency created by statute to enforce the Minnesota Human Rights Act, Minn.Stat.Ann. §§ 363.01–.14. The complaints alleged that the Jaycees' exclusion of women from full membership violated Minn.Stat.Ann. § 363.03 subd. 3, which reads as follows:

Subd. 3. *Public accommodations.* It is an unfair discriminatory practice:

To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommo-

dation because of race, color, creed, religion, disability, national origin or sex. It is an unfair discriminatory practice for a taxicab company to discriminate in the access to, full utilization of or benefit from service because of a person's disability.

The term "place of public accommodation" is defined in Minn.Stat.Ann. § 363.01 subd. 18:

Subd. 18. *Public accommodations.* "Place of public accommodation" means a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public.

On January 25, 1979, the Commissioner of the Department of Human Rights found probable cause to believe that the statute had been violated and ordered that an evidentiary hearing be held before a state hearing examiner. On February 27, 1979, the Jaycees brought suit in the United States District Court for the District of Minnesota, seeking declaratory and injunctive relief against the enforcement of the Human Rights Act. The plaintiff claimed that application of the Act to force it to accept women as regular members would violate its rights of speech and association under the First and Fourteenth Amendments to the Constitution of the United States. It asked the District Court to abstain from deciding the constitutional question until the state administrative agency had decided whether the Jaycees fit the definition of "place of public accommodation" in the state law. The District Court, with the agreement of all parties, dismissed the suit without prejudice, stating that it could be renewed if the state administrative decision turned out to be adverse to the Jaycees. The parties continue to agree on this procedure, under which the state forum decides the meaning of the statute, and the

federal courts decide its validity under the federal Constitution.[4]

The state agency proceeding thereupon went forward, and an evidentiary hearing was held before a hearing examiner. Following the hearing, the examiner filed findings of fact and conclusions of law. He held that "the United States Jaycees are a place of public accommodation" and that the Jaycees had committed an unfair discriminatory practice. *State of Minnesota, by William L. Wilson, and his successor, Marilyn E. McClure, Commissioner, Department of Human Rights v. The United States Jaycees,* No. HR–79–014–GB, slip op. p. 9 (Minn. Office of Hearing Examiners, for the Dept. of Human Rights, findings, conclusions, and order filed October 9, 1979). The examiner entered the following order, *id.* at 9–10:

It is hereby ordered that the United States Jaycees shall cease and desist and is hereby enjoined from:

(1) Revoking the charter of any Jaycee local organization member ("local chapter") or state organization member (the "Minnesota Jaycees") within the State of Minnesota or denying any privilege or right of membership, or otherwise discriminating in any manner against a local or state organization member within the State of Minnesota because either extends to women all the rights and privileges of individual and regular membership.

(2) Discriminating on the basis of sex against any member or applicant for membership of a Jaycee local chapter within the State of Minnesota with re-spect to the terms, conditions, or privileges of membership in the local chapters or in the Minnesota Jaycees or in the United States Jaycees.

The Jaycees then came back to the District Court and, on October 31, 1979, filed the present suit, asking that the enforcement of the state agency's order be enjoined on federal constitutional grounds. The District Court certified to the Supreme Court of Minnesota the following question of state law:

Is the United States Jaycees a "place of public accommodation" within the meaning of Minn.Stat. § 363.01 Subdivision 18?

In an opinion filed on May 8, 1981, the Supreme Court of Minnesota answered yes. *United States Jaycees v. McClure,* 305 N.W.2d 764 (1981) (6–3 decision). The Court held that the plaintiff organization is "a business ... facility ... whose goods, ... privileges, [and] advantages are ... sold or otherwise made available to the public." See *id.* at 772. Men between 18 and 35 are indiscriminately admitted to membership, it said, without any selectivity. The organization is in the business of selling memberships, a business it assiduously promotes. Commercial language, *e.g.,* "marketing," is used to describe the recruitment of new members, and recruitment is heavily emphasized. There is no evidence that any man between 18 and 35 who wished to join the Jaycees has ever been refused. The leadership skills and personal-development techniques promised to new members if they become active Jaycees are

---

4. This procedure is said to be in accord with *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). But in *England* the federal suit was brought long before any state proceedings had begun, see 375 U.S. at 413 n. 1, 84 S.Ct. at 463 n. 1. *England* holds only that parties remitted to the state forum under the doctrine of abstention to get an authoritative construction of state law, may thereafter return to the federal courts to litigate their federal constitutional claim. We are not sure that it is properly applied to a case in which state enforcement proceedings have already been instituted. In such a case, the state officials might well argue that the federal courts should bow out altogether, under the rule of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), leaving the plaintiff to present all of its arguments, state and federal, to the state administrative agency, to the state courts on review of the agency's decision, and then to the Supreme Court of the United States on appeal from or certiorari to the Supreme Court of the state. The defendants here have never made this suggestion. *Younger* is a doctrine of equitable discretion, not of subject-matter jurisdiction, and it can hardly have been an abuse of discretion for the District Court (or this Court) to decide the merits of plaintiff's federal claim when both sides urge precisely that.

the goods and advantages that members buy when they pay their dues. The Court disclaimed any intention to affect "private organizations such as the Kiwanis International Organization":

Private associations and organizations —those, for example, that are selective in membership—are unaffected by Minn. Stat. § 363.01(18) (1980). Any suggestion that our decision today will affect such groups is unfounded.

We, therefore, reject the [Jaycees] national organization's suggestion that it be viewed analogously to private organizations such as the Kiwanis International Organization.

*Id.* at 771.

Chief Justice Sheran, joined by Justices Peterson and Todd, dissented. The Chief Justice said:

Although the result reached in the majority opinion is felicitous, I cannot believe that the members of the Minnesota legislature who voted for the law we have been called upon to construe thought the Junior Chamber of Commerce, a service organization, to be "a place of public accommodation." The obligation of the judiciary is to give that meaning to words accorded by common experience and understanding. To go beyond this is to intrude upon the policymaking function of the legislature. The majority opinion does that in this case to a degree which compels this expression of dissent.

*Id.* at 774.

The parties then returned to the District Court, which conducted an additional evidentiary hearing. On March 25, 1982, the District Court filed its opinion holding the Jaycees' constitutional claims without merit and dismissing the complaint with prejudice. *United States Jaycees v. McClure,* 534 F.Supp. 766 (D.Minn.1982). The Court first considered whether the Jaycees' claimed "right to 'associate for the purpose of advancing only the interests of young men,'" *id.* at 770, was part of the freedom of association protected by the First Amendment. The Court noted that "[i]t is questionable whether association not directed at the exercise of other First Amendment rights enjoys constitutional protection," *ibid.,* but concluded that it need not resolve that question, because "if there is such a right, it has not been unconstitutionally denied to the Jaycees." *Ibid.* Two related reasons were given for this conclusion: that invidious private discrimination is not entitled to affirmative constitutional protection, and that the State's interest in preventing discrimination in access to public accommodations is in any event sufficiently compelling to override whatever right of association exists. The Court stressed, as had the Minnesota Supreme Court, that the Jaycees holds itself out as a leadership training organization, giving members an advantage in business and civic advancement. It characterized the process of recruitment as the sale of memberships. "The Jaycees itself refers to its members as customers and membership as a product it is selling." *Id.* at 769.

The District Court also rejected the Jaycees' arguments based on vagueness and overbreadth. As to vagueness the Court held that the "term 'place of public accommodation' when construed with normal aids to statutory construction can be understood by those of common understanding to apply to the Jaycees," *id.* at 773, especially in light of the opinion of the Minnesota Supreme Court. The overbreadth challenge was also rejected. As construed by the Supreme Court of Minnesota, "the statute is only applicable to public business facilities which practice sex discrimination." The District Court rejected the argument that the statute as interpreted by the Supreme Court might apply to other organizations, "including the Boy Scouts, the Kiwanis, the Sweet Adelines, and the like," because "[t]here is insufficient evidence in the record pertaining to the activities of these groups to allow any determination whether the statute would apply to them and whether the groups engage in protected First Amendment activity." *Id.* at 773.

The plaintiff appeals, pressing again its threefold claim that the Minnesota Human

Rights Act, as construed by the Supreme Court of Minnesota, violates its freedom of association, is void for vagueness, and is unconstitutionally overbroad.

## II.

The First Amendment, which the Fourteenth has made applicable to the states, reads as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The Amendment does not contain the word "association," nor does any other portion of the Constitution, as, for example, the Ninth Amendment or the Due Process Clause of the Fourteenth Amendment, protect by express words any "right" or "freedom" "of association." Defendants argue that association is constitutionally protected only as an incident of the specific rights listed in the First Amendment—religion, speech, press, and assembly to petition for redress of grievances. Since the Jaycees is nothing more than a business selling memberships and leadership training, they argue, it has no right to First Amendment protection, except possibly the lesser degree of protected status enjoyed by purely commercial speech. Our first task, therefore, is to determine to what extent freedom of association is constitutionally protected, and whether the Jaycees' activities qualify for whatever protection the law affords. We of course take as a given that the Jaycees is a "place of public accommodation" within the meaning of the Minnesota statute. The Supreme Court of Minnesota has answered that question, and it has the last word. Its "construction fixes the meaning of the statute [and] . . . puts . . . words in the statute as definitely as if it had been so amended by the legislature." *Winters v. New York,* 333 U.S. 507, 514, 68 S.Ct. 665, 669, 92 L.Ed. 840 (1948). On the further question, though, whether the activity in question, whatever its significance under state law, is protected by the federal Constitution, we are not concluded by the opinion of the state court. We must decide that issue for ourselves. "[A] State cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button,* 371 U.S. 415, 429, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963); *Bigelow v. Virginia,* 421 U.S. 809, 826, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975).

### A.

Many of the cases that have discussed freedom of association have arisen in the context of speech or political activity that is at the core of the First Amendment. *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), is such a case. There, the Supreme Court struck down a state-imposed requirement that the names of members of a politically unpopular group be made public, on the ground that the group's advocacy of political and legal change would thereby be unacceptably retarded. Similar protection has been extended to group use of litigation as a means for changing the law. *NAACP v. Button, supra.* See also *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976) (per curiam) (association in support of political candidates). We know of no Supreme Court opinion, however, that rigidly limits the right of association to the context of political beliefs or expression. On the contrary, *NAACP v. Alabama* itself states that "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." 357 U.S. at 460–61, 78 S.Ct. at 1170–71. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Id.* at 460, 78 S.Ct. at 1170.

Other cases go well beyond any concrete connection with the specific language of the First Amendment in describing the right of association. In *Shelton v. Tucker,* 364 U.S.

479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), for example, the Court had before it an Arkansas statute requiring every teacher in a state-supported school or college, on pain of dismissal, to file each year an affidavit listing every organization to which he or she had belonged or regularly contributed within the last five years. The law was held invalid. The Court noted, among other things, that the statute "requires [teachers] to list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious. Many such relationships could have no possible bearing upon the teacher's occupational competence or fitness." *Id.* at 488, 81 S.Ct. at 252. The Court declared that "to compel a teacher to disclose his every associational tie is to impair that teacher's right of free association, a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *Id.* at 485–86, 81 S.Ct. at 250–251. The Court may have suspected—and not without reason—that the statute under attack was part of a broader scheme to thwart the efforts of the NAACP to enforce the law of school desegregation. But the opinion is not placed on that ground (in fact, one of the plaintiffs went so far as to aver that he did *not* belong to the NAACP), and the Court does not imply that nonpolitical associations or groups ("social, professional, ... avocational," *id.* at 488, 81 S.Ct. at 252) are less protected than political or religious ones. Rather, the right of association is portrayed as a "fundamental personal libert[y]," *ibid.,* which the state may not broadly stifle if less drastic means are available to serve its legitimate purposes.

A more striking case is *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The Supreme Court of Illinois, purporting to exercise the power to regulate the practice of law that courts had possessed (or thought they had) from time immemorial, had forbidden the United Mine Workers to employ a salaried attorney to prosecute workers' compensation claims for union members who "wished his services." *Id.* at 218, 88 S.Ct. at 354. Such conduct, the

Illinois courts thought, amounted to the unauthorized practice of law. The Supreme Court reversed and held the union's conduct protected by the First and Fourteenth Amendments. An attempt to distinguish *NAACP v. Button, supra,* "as concerned chiefly with litigation that can be characterized as a form of political expression" was rejected. 389 U.S. at 221, 88 S.Ct. at 355. "We do not think our decisions in [*Railroad*] *Trainmen* [*v. Virginia Bar,* 377 U.S. 1, 84 S.Ct. .1113, 12 L.Ed.2d 89 (1964),] and *Button* can be so narrowly limited. We hold that freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights." 389 U.S. at 221–22, 88 S.Ct. at 355–356 (footnote omitted). "The litigation in question is, of course, not bound up with political matters of acute social moment, as in *Button,* but the First Amendment does not protect speech and assembly only to the extent it can be characterized as political." *Id.* at 223, 88 S.Ct. at 356.

*Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), contains perhaps the broadest statement of the right of association, though it may be dictum. "The association of people is not mentioned in the Constitution nor in the Bill of Rights," Justice Douglas said for the Court. "Yet the First Amendment has been construed to include" that right. *Id.* at 482, 85 S.Ct. at 1680. "[W]e have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members." *Id.* at 483, 85 S.Ct. at 1681. The Court added, in words that have definite implications for the case before us:

The right of "association," like the right of belief, is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment

its existence is necessary in making the express guarantees fully meaningful. *Ibid.* (citation omitted). Cf. *Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 577–79, 100 S.Ct. 2814, 2827–2828, 65 L.Ed.2d 973 (plurality opinion of Burger, C.J., joined by White and Stevens, JJ.) (there is a right to assemble in public places for any lawful purpose; the Constitution recognizes certain "important rights not enumerated," including "the rights of association and of privacy").

Our own cases have recognized a right of association in similar broad terms.[5] In *American Federation of State, County, and Municipal Workers v. Woodward,* 406 F.2d 137 (8th Cir.1969), we held that the discharge of public employees on account of union activities was a violation of the First Amendment. "The First Amendment protects the right of one citizen to associate with other citizens for any lawful purpose free from government interference." *Id.* at 139. The broad language from *Griswold,* just quoted in this opinion, was cited as authority for that proposition. *Gay Lib v. University of Missouri,* 558 F.2d 848, *rehearing en banc denied by an equally divided Court,* 558 F.2d 859 (8th Cir.1977), upheld the right of a student organization "comprised largely of homosexuals," *id.* at 850, to recognition by a university, despite the fact that homosexual *conduct* was a crime under the law of Missouri, a law whose validity the Court did not seem to question at the time. We quoted the passage from Justice Harlan's opinion in *NAACP v. Alabama, supra,* holding that freedom to associate for the purpose of advancing cultural beliefs is protected, 558 F.2d at 856, and we noted that the purpose of Gay Lib was not alone to advocate changes in the law—an activity within the narrowest interpretation of the First Amendment—but also to allow its members

an opportunity for "meeting one another to discuss their common problems and possible solutions to those problems . . . ." *Id.* at 853 n. 9 (quoting *Gay Alliance of Students v. Matthews,* 544 F.2d 162, 166 (4th Cir. 1976)). See also *Greminger v. Seaborne,* 584 F.2d 275, 278 (8th Cir.1978) ("Freedom of association includes membership in unions or other organizations concerned with 'business or economic causes.'" (quoting *AFSCME v. Woodward, supra,* 406 F.2d at 139)).

We must be properly cautious, of course, about drawing broad conclusions from rather general statements in court opinions. The context in which a statement is made always colors or limits the apparent generality of the statement, to a greater or lesser degree. The job of courts is to decide cases. We do not write texts or law-review articles. But this much at least seems tolerably clear from our canvass of the Supreme Court's and our own opinions in this area: There are rights protected by the federal Constitution that are not specifically spelled out in so many words in that document. Among these rights is the right or freedom of association, and this right has not been rigidly limited to groups whose activities fall clearly within the specific guarantees of the First Amendment. One kind of association, *e.g.,* a political party, see *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), may enjoy a greater degree of protection than another. It may be, for example, that association for ends specifically mentioned in the First Amendment will prevail against all state interests not regarded as "compelling," while other kinds of association may be required to yield to less imperative demands of public policy. The latter species of association, on this view, would be protected not by the specific guarantees of the Bill of Rights, but by the more nebulous concept of substantive due process, an oxymoron if there ever was one.[6] Before deciding how far we

---

5. The District Court observed that "Certain language in decisions of this circuit . . . suggests that freedom of association itself may be

a 'basic constitutional freedom.'" 534 F.Supp. at 770. We agree.

6. This seems to be what Professor Tribe means when he suggests that association unrelated to

must pursue this excursion into constitutional theory, however, we return to the specifics of this case, and inquire just what kind of association is involved here.

### B.

■ Defendants' description of the Jaycees is simple and logical: The plaintiff organization is simply a business selling memberships, and the leadership training that goes with them, indiscriminately to any man between 18 and 35 who wishes to buy. The activity is purely commercial, and the State has the undoubted power to purge it of discrimination on the basis of irrelevant personal characteristics like sex. If the facts were as asserted, this case would be easy. No extended analysis would be necessary to show that the Jaycees must lose. With all deference to those who have reached a contrary conclusion, however, our study of the record leads us to the definite and firm conviction that this view of the Jaycees is so partial as to be distorted. The organization does not fit the bed of Procrustes that the defendants designed for it.

Certainly the Jaycees vigorously recruits new members, and stresses the supposed benefits of membership to its prospects' business careers as well as to their personal lives. Its activities are said to train members to manage their time better, to speak better, and to be better citizens. The term "marketing" has been used to describe this promotional process, and by using that and similar language the Jaycees has been to some extent justifiably hoist with its own petard. So far the similarities with, say, the Dale Carnegie organization are plain. But much more is involved here. The Jaycees does not simply sell seats in some kind of personal-development classroom. Personal and business development, if they come, come not as products bought by members, but as by-products of activities in which members engage after they join the organization. These activities are variously social, civic, and ideological, and some of

them fall within the narrowest view of First Amendment freedom of association.

Some of what local chapters do is purely social. They have parties, with no purpose more complicated than enjoying themselves. Some of it is civic. They have conducted a radio fund-raising drive to combat multiple sclerosis. They have conducted a women's professional golf tournament. They have engaged in many other charitable and educational projects for the public good. (And there is no claim, incidentally, of any discrimination in the offering to the public of the benefits of these projects. Money raised to fight disease, for example, is not used to benefit only male patients.) And they have advocated, through the years, a multitude of political and social causes. Governmental affairs is one of the chief areas of the organization's activity. Members on a national, state, and local basis are frequently meeting, debating issues of public policy, taking more or less controversial stands, and making opinions known to local, state, and national officials.

The record contains many examples of this political and ideological activity. We mention only a representative selection. The By-Laws and Policy Manual in effect at the time of trial in the District Court contains, even before the By-Laws themselves, four "Declarations of External Policy" adopted by the membership as represented in national convention. These resolutions support a balanced budget, a fund drive to fight muscular dystrophy and juvenile diabetes, legislation to permit "voluntary prayer in American schools," and the economic development of Alaska. All of these propositions, except the second one, relate to highly controversial political questions. The prayer policy recites, for example, that "the framers of our Constitution never meant for [sic] federal restrictions on free exercise of religious practice or speech" and that "[t]he United States Jaycees is built on a foundation of faith, as witnessed by the first line of the Jaycee Creed, 'We

the specific guarantees of the First Amendment "has been protected, if at all, only as an aspect of the less well pedigreed rights of privacy and

personhood ...." Tribe, *American Constitutional Law* 701 (1977).

believe that faith in God gives meaning and purpose to human life.'"

Over the years, the national organization has taken stands in favor of the draft, the efforts of the FBI "to eliminate disloyalty" in this country before World War II, the formation of the United Nations, an increase in the corporate income tax, the recommendations of the Hoover Commission on reorganization of the federal government, the ratification of the Panama Canal Treaty, the 18-year-old vote, the vote for citizens of the District of Columbia, the "defense of freedom" in Vietnam, and (apparently at a later time) the withdrawal of U.S. troops from Southeast Asia. It has opposed "one-man" congressional committees, "socialized medicine," federal funds for teachers' salaries and school construction, and pornography. More recently, the Jaycees has embarked on a nation-wide program in support of President Reagan's economic policies, called "Enough is Enough," and it has advocated passage of a bill to limit the appellate jurisdiction of the Supreme Court in cases involving "voluntary prayer." Local and state groups have also taken political stands. Sixteen state organizations have asked their respective legislatures to join in calling a constitutional convention to adopt a balanced-budget amendment to the Constitution of the United States—an activity within the most literal reading of the Assembly Clause of the First Amendment. State and local Jaycee groups have advocated a reduction in the size of the Minnesota Legislature, a bill to save seals, and a change in the form of city government in El Dorado, Arkansas. These and similar actions are reported from time to time in a magazine called *Future,* published by the Jaycees.

The Jaycees is not a political party, or even primarily a political pressure group, but the advocacy of political and public causes, selected by the membership, is a not insubstantial part of what it does. Further, all of its doings are colored by the adoption and recitation at meetings of the Jaycee "Creed," quoted *ante* at 1562, which espouses "faith in God" and "free enterprise" and declares that "the brotherhood of man transcends the sovereignty of nations." Most Americans may regard these sentiments as no more than pious platitudes, but they nonetheless have a distinct ideological content. Some people do not believe in God; some do not agree that "free enterprise" is the best way to win "economic justice," and some care more about "the sovereignty of nations," or a particular nation, than they do about "the brotherhood of man." Those who join the Jaycees identify themselves, emotionally and philosophically, with the beliefs expressed in this Creed. The same cannot be said of Dale Carnegie and similar self-improvement enterprises.

We conclude that a good deal of what the plaintiff does indisputably comes within the right of association, even as limited to association in pursuance of the specific ends of speech, writing, belief, and assembly for redress of grievances. That there is a right involved, however, does not get the plaintiff all the way to the legal haven where it would be. Even First Amendment rights, the Supreme Court has often held, must yield at times to state interests, just as that "liberty" which the Due Process Clause protects is not insulated from every assault of government, but only from deprivation "without due process of law." We turn, therefore, to consideration of the degree to which the State wishes to interfere with the plaintiff's right of association, and of the nature of the State interest advanced to support the challenged interference.

C.

■ There are a number of ways in which government may seek to abridge the freedom of association. It may directly punish the act of membership; it may intrude upon the group's internal organization or integral activities; it may withhold a benefit or privilege from members of the association; or it may compel disclosure of the fact of membership. See Tribe, *American Constitutional Law* 703 (1977). The validity of a particular abridgement-in-fact can be determined only after a careful anal-

ysis of the extent and nature of the abridgement, the state interest asserted to justify the abridgement, the extent to which this interest will be impaired if the abridgement is set aside by the courts, and the extent to which this interest can be vindicated in less intrusive ways. All of these factors, and the balance among them, must be considered. None of them, considered in isolation, will be dispositive. As, for example, the type of abridgement grows more burdensome, the state interest may need to be relatively more compelling in order to sustain it. The inquiry is inescapably somewhat imprecise, and for that reason may not be so satisfying, and will not be so logically demonstrable, as the answers to some other kinds of legal questions. But it must nevertheless be undertaken.

The abridgement at issue here is of the second type listed above. Government asserts the power to determine who shall be eligible for membership in the Jaycees. This kind of assertion of state power is not often encountered. It goes to the heart of the kind of association that plaintiff has had and desires to continue, an association for the advancement of the interests of young men. If the statute is upheld, the basic purpose of the Jaycees will change. It will become an association for the advancement of young people. Young men will no longer be its only beneficiaries. It is natural to expect that an association containing both men and women will not be so single-minded about advancing men's interests as an association of men only. Moreover, government will be deciding the membership of a group one of whose major activities is to petition the government for redress of grievances. It is true enough that the specific content of most of the resolutions adopted over the years by the Jaycees has nothing to do with sex. Men are no more likely than women, as such, to favor the United Nations or a balanced budget. But some change in the Jaycees' philosophical cast can reasonably be expected. It is not hard to imagine, for example, that if women become full-fledged members in any substantial numbers, it will not be long before efforts are made to change

the Jaycee Creed. Young women may take a dim view of affirming the "brotherhood of man," or declaring how "free men" can best win economic justice. Such phrases are not trivial. The use of language betrays an attitude of mind, even if unconsciously, and that attitude is part of the belief and expression that the First Amendment protects. An organization of young people, as opposed to young men, may be more "felicitous," more socially desirable, in the view of the State Legislature, or in the view of the judges of this Court, but it will be substantially different from the Jaycees as it now exists.

The State emphasizes, and rightly, that the Jaycees is not an intimate group. It has about 300,000 members nationwide, and there is no evidence in this record that any particular man who wanted to be a member has ever been rejected. On one occasion new members were even sought door-to-door. So far as the national By-Laws are concerned, members need only be male, between 18 and 35 years of age, and willing to pay the first year's dues (in the neighborhood of $25). This is hardly a private club, in the customary sense of that word, and it is certainly not "exclusive." There is a sense in which the word "public" is justly used of such an organization. We have no doubt that if the Jaycees operated a swimming pool, a bar, or a restaurant, the facility would have to be open to women as well as men. See, *e.g., Tillman v. Wheaton-Haven Recreation Ass'n,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *United States v. Trustees of the Fraternal Order of Eagles,* 472 F.Supp. 1174 (E.D.Wis.1979).

But more is at stake here than swimming, food, or drink. The Jaycees is a genuine membership organization, whose members govern its affairs and decide its policies, not just a vehicle for the delivery of commercial goods and services. Furthermore, the state has overstated to some extent the degree to which membership is open to young men indiscriminately. The eligibility criteria we have discussed up to now are all in the national By-Laws. Local chapters are free, to some extent, to impose other require-

ments, and the St. Paul chapter has done so. (No one may be a member of the national group without being a member of a local chapter.) The St. Paul By-Laws require that applicants be of "good character and reputation." I H.E. Tr. 184.[7] No one has ever been rejected under that clause, but "[u]nder the appropriate circumstances," *ibid.,* someone could be. In addition, walk-in applicants are rare. *Id.* at 144. One important means of recruitment is individual contacts between existing members "and friends or acquaintances of theirs or people they run into." *Ibid.* Perhaps for this reason, the membership is homogeneous to a substantial degree. About 30 per cent. of the members of the Minneapolis chapter are "upper management," and perhaps another 20 per cent. are "middle management," although far less than half the population from which members are drawn are involved in either middle or upper corporate management. *Id.* at 148. Recruitment for membership in the Minneapolis Jaycees is not held out "to all members of the public." *Ibid.* Of the St. Paul chapter, about 60 per cent. of the members are in "corporate management," *id.* at 183, and no more than five members out of about 400 work in government, although of all the communities in Minnesota, St. Paul presumably "is the most heavily populated by Government employees." *Id.* at 183–84. There is, in other words, a certain *de facto* process of selection at work here. The Jaycees is not exclusive or private, in the sense of small or intimate; but neither is it a cross-section of the community, even of the young male community.

We next examine the nature of the interference with the Jaycees' membership practices that state policy would produce. The intrusion is both direct and substantial. The State is not merely making the Jaycees' desired policy more difficult, or more expensive. We have here no mere disclosure law, no simple withholding of state favor or benefits. The membership practice at issue is directly prohibited. The Jaycees'

membership policy will have to be changed, if the State statute is upheld. If it is not, every person responsible, including those who aid or abet the violation, will be guilty of a misdemeanor, Minn.Stat.Ann. § 363.-101 (West Cum.Supp.1983). In addition, if the Jaycees fails to comply, the Commissioner of the Department of Human Rights may apply to a state district court for an order directing compliance, Minn.Stat.Ann. § 363.091 (West Cum.Supp.1983), and violation of such a court order would presumably be punishable as a contempt. Furthermore, it is not clear that the effect of the Department of Human Rights' cease-and-desist order can be avoided simply by withdrawing from the State of Minnesota. In theory, the Jaycees can choose to leave the state; but the order may mean that they may not do so for the purpose of preserving their preferred membership policy, and there is no reason to suppose that they would ever wish to do so for any other reason.

The defendants assert that the state interest involved is "compelling" enough to override whatever right of association plaintiff possesses in its male-only membership policy. The state interest—"preventing discrimination in public accommodations on the basis of sex," *United States Jaycees v. McClure,* 534 F.Supp. 766, 771 (D.Minn. 1982)—is certainly "compelling" in the general sense of that word. To clear the channels of commerce of the irrelevancy of sex, to make sure that goods and services and advancement in the business world are available to all on an equal basis, without regard to immaterial personal characteristics—these are public purposes of the first magnitude. But whether the asserted interest is "compelling" in a particular set of circumstances, whether the interest is "compelling" *enough* to override the right asserted, is a question that requires, we think, a more particularized analysis.

Here, upholding the claimed right of association would impair the asserted compelling state interest, but only to a limited

---

7. This reference is to Volume I of the Transcript of the hearing before the hearing examiner, held on April 23, 1979.

extent. Places of public accommodation in the ordinary sense of business establishments at which goods and services are sold to the public would continue to be subject to the full vigor of the law. So would the Jaycees, insofar as any of their community activities, sales of goods, or employment practices are concerned. All of these activities would be free of discrimination in the future, as (so far as the record before us shows) they have been in the past. It is only the Jaycees' membership practices that would be affected if this particular application of the state public-accommodations law is prohibited. In this regard, we think it significant that the state interest being asserted is the interest in freedom from discrimination in public accommodations generally. If we were dealing with a statute that straightforwardly forbade membership discrimination in groups of more than a certain size that derived a substantial amount of support from business, or if the record showed that membership in the Jaycees was the only practicable way for a woman to advance herself in business or professional life, a different sort of weighing would have to take place, and such a statute might be upheld. But that is not this case. We know that some of the Jaycees' support comes from businesses which pay dues for their employees, but we do not know how much, either in absolute dollars or as a share of the Jaycees' total dues income. We know that membership in the Jaycees has been of some help to the complaining individuals in their corporate careers, but we do not know whether similar organizational experience in other clubs or associations, open either to both sexes or to women only, has been or could be of similar or greater help to these or other women. Either a legislative or a judicial record illuminating these and similar questions of fact would have been of substantial use to the state in this case.

Other factors also dilute somewhat the force of the state's interest here. The Jaycees is the only group whose membership practices have ever been subjected to this law. Yet, there are hundreds of private (in the sense of nongovernmental) associations in this country whose membership is limited either to men or to women. See Gale, *Encyclopedia of Private Associations* (16th ed. 1981).[8] Some of these groups seem pretty close to the Jaycees, and yet the Supreme Court of Minnesota has held that the law does not apply to one of them, the Kiwanis. Of this, more hereafter in Part III. of this opinion, in which we deal with the vagueness argument. We mention the point here only because an asserted state interest that is being applied only selectively appears to that extent weaker than a state policy applied consistently and across the board.

Finally, there are other ways in which the state can express its displeasure with the Jaycees' discriminatory membership practice, ways less directly and immediately intrusive on the freedom of association than an outright prohibition enforced or enforceable by the criminal law. State officials could be instructed not to appear at any function of any discriminatory club, not to do any business with such a club, and to give no official recognition to it. State officials and employees, at least those above a certain level, could be instructed not to join such a club. Those who seek public office or preferment may validly be required to accept it *cum onere*, to divorce themselves from groups or activities that indulge in invidious discrimination. Any state tax concessions, *e.g.*, the deduction for charitable contributions, could be withdrawn. It could also be made unlawful (indeed, it may be already) for an employer to subsidize an employee's membership in any discriminatory club, or to give that membership any favorable weight in deciding whether to promote an employee. We cannot say that these measures, less direct than the flat prohibition before us in this case, would be just as effective in eliminating discrimination. Probably they would not be. The record simply does not answer that question. But the existence of less

---

**8.** A previous edition of this treatise was introduced into evidence at trial, but it was not made available to us as part of the Designated Record.

intrusive means for effectuating state policy, even if less than completely effective, is still a relevant factor. At some point the right of association claimed may be so strong, and the state interest asserted comparatively so weak, that the existence of somewhat less effective alternative means may be enough to tip the constitutional balance against the state.

Obviously these are questions of degree. The lines are not always clear, just as the line is not always clear between collective-bargaining activities, for which members of the bargaining unit, whether or not they are members of the union, may be compelled to contribute, "and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." *Abood v. Detroit Board of Education,* 431 U.S. 209, 236, 97 S.Ct. 1782, 1800, 52 L.Ed.2d 261 (1977). The degree of constitutional protection to which certain conduct is entitled becomes progressively greater as the element of "speech" or "expression" grows, and that of "act" or "conduct" increases. It becomes progressively less as the speech begins to appear more "commercial." Despite the imprecision of these categories, "a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." *Bigelow v. Virginia,* 421 U.S. 809, 826, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975). In determining how the balance should be struck here, we turn to an examination of certain cases claimed by one side or the other to be persuasive.

### D.

The parties refer us to various opinions of the Supreme Court that are claimed to support their positions. Plaintiff stresses the following passage from a dissenting opinion of Justice Douglas, joined by Justice Marshall, in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 179–80, 92 S.Ct. 1965, 1974, 32 L.Ed.2d 627 (1972) (footnote omitted):

My view of the First Amendment and the related guarantees of the Bill of Rights is that they create a zone of privacy which precludes government from interfering with private clubs or groups. The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires. So the fact that the Moose Lodge allows only Caucasians to join or come as guests is constitutionally irrelevant, as is the decision of the Black Muslims to admit to their services only members of their race.

It also cites the concurring opinion of Justice Goldberg, joined by Warren, C.J., and Douglas, J., in *Bell v. Maryland,* 378 U.S. 226, 286, 313, 84 S.Ct. 1814, 1847, 1861, 12 L.Ed.2d 822 (1964):

Prejudice and bigotry in any form are regrettable, but it is the constitutional right of every person to close his home or club to any person or to choose his social intimates and business partners solely on the basis of personal prejudices including race. These and other rights pertaining to privacy and private association are themselves constitutionally protected liberties.

We cannot agree that these passages are of much help, despite our respect for the authors. For one thing, they appear in separate opinions, not opinions of the Court. And for another, it is not clear to us that the Jaycees is a "private club" in the sense in which that phrase is used in the opinions cited. In *Moose Lodge* the opinion of the Court described Lodge No. 107 as "a private club in the ordinary meaning of that term," 407 U.S. at 171, 92 S.Ct. at 1970, and noted that it had "well-defined requirements for membership." *Ibid.*[9] The Jaycees' mem-

9. *But cf. Commonwealth Human Relations Comm'n v. Loyal Order of Moose,* 448 Pa. 451, 294 A.2d 594 (1972) (the Moose Lodge is a

"place of public accommodation" under a Pennsylvania statute, 43 Pa.Stat. § 954; dining room may not refuse a member's black guest;

bership requirements may be less restrictive than those of the Moose Lodge. Our holding above that the Jaycees have a constitutionally protected right of association turns more on the presence of traditional First Amendment activity such as speech and advocacy of public causes, than on notions of privacy or intimacy.

Defendants refer us to *Norwood v. Harrison,* 413 U.S. 455, 470, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973), where the Court said that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." But that phrase appears in the course of an opinion invalidating the provision by a state of textbooks to a discriminatory school. The context—affirmative aid by the state to a discriminatory activity—is quite different from the present case. The Court's holding had only the effect of withdrawing official sanction from discrimination.

*Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), is probably stronger authority for the defendants here. That case holds that 42 U.S.C. § 1981 prohibits a private school from excluding students on the basis of race. The school was commercially operated and advertised broadly for applicants without in any way implying that all races would not be equally welcome. After holding that § 1981 applies to this kind of conduct, the Court went on to reject the school's claim that the statute, as so applied, violated the First Amendment right of association. The Court quoted the passage from *Norwood v. Harrison, supra,* which we have already described, and then added that the school had not shown that the admission of black students would in any way inhibit the teaching of any ideas or dogma. 427 U.S. at 176, 96 S.Ct. at 2597.

We believe *Runyon* is not in point, for several reasons. The Court was careful to state, at the outset of its opinion, that the cases before it "do not present any question but discrimination as to membership itself is of the right of a private social organization to limit its membership on racial or any other grounds." 427 U.S. at 167, 96 S.Ct. at 2592 (footnote omitted). The Jaycees may not be "private" or "social" in quite the sense that the *Runyon* Court used those terms, but it comes closer to those categories than a school that holds itself out as willing to sell its services to any member of the public. Moreover, admission of a student to a school has nothing necessarily to do with the school's own internal governance. Nonpublic schools are governed by their owners or boards of trustees, not by a vote of the student body. The Jaycees, on the other hand, is governed by its members and their elected representatives, and a change in the makeup of the membership could well result in a change in the ideas or dogma that the organization propagates. Furthermore, a student at a school is a consumer of educational services. The school does not normally take positions on public issues, or have a "Creed," or ask the government, state or federal, for redress of grievances. Members of the Jaycees receive educational services, in a sense, in the form of leadership training and experience, but they do much more than that, as we have tried to illustrate earlier in this opinion. *Runyon* is not controlling, though it may help the defendants here more than it does the plaintiff.

A closer case, in some ways, is *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945). A New York statute prohibited labor organizations from denying membership to anyone on account of race, color, or creed. The Railway Mail Association, an organization of postal clerks, limited membership to males of the Caucasian or native American Indian race. The association argued that the statute violated the Fourteenth Amendment "as an interference with its right of selection to membership and abridgment of its property rights and liberty of contract." *Id.* at 93, 65 S.Ct. at 1487. The controversy had arisen when a branch association attempted to admit persons not of the Caucasian race. *Id.* not forbidden, 294 A.2d at 598–599).

at 93 n. 10, 65 S.Ct. at 1487 n. 10. The Supreme Court upheld the state law. It noted, among other things, "that the terms imposed by a dominant union apply to all employees, whether union members or not." *Id.* at 94, 65 S.Ct. at 1487. And therein lies the crucial distinction between *Corsi* and this case. We do not for a moment doubt the validity of a law, state or federal, forbidding sex as well as race discrimination by unions. Indeed, federal law now does just that. 42 U.S.C. § 2000e–2(c)(1). But unions are not the Jaycees. The consequence of being excluded from a union, for a person who must work under an agreement between the union and the employer, is much more severe than the consequence of being excluded from any other group that does not have the quasi-governmental power to affect non-members through collective bargaining.[10]

In short, our decision is not controlled by precedent. We must look to principle and reason. Several factors are important to our analysis. The regulation at issue here, though not overtly related to the content of what the Jaycees are saying, nevertheless has the potential of changing that content, because it purports to specify, in one respect at least, the identity of those who may be Jaycees, and who therefore determine the content of what Jaycees say. Speech and advocacy are not the only things Jaycees do, but they are a significant part of it. We are not in the less well protected area of commercial speech. The special tests, easier for the state to pass, that apply in that area come to bear only when speech is "related *solely* to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S.

557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980) (emphasis supplied). Nor are we dealing with speech that itself proposes an illegal act, as in *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rights,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). The state wants the Jaycees' activities expanded, not forbidden. And, even though we might think that the Jaycees would survive, even be improved, if women were admitted, some scope must be given to the private choice of those who are now in the organization. The right to choose with whom one *will* associate necessarily implies, within some limits, the right also to choose with whom one will *not* associate.

The interest of the state, though compelling in the general sense, will be less seriously impaired than at first appears if this challenged interference is prevented, for reasons we have already explained. And the state has other ways, perhaps less effective, but still powerful, to vindicate its interest. Once a serious incursion on a First Amendment right of association is shown, the normal presumption of constitutional validity is reversed. The state must show that its interference with the claimed right is clearly justified. We are not persuaded that the required showing has been made here, and we therefore hold that the application of the state public-accommodations law to the Jaycees' membership policies is, in the circumstances of this case, invalid under the First and Fourteenth Amendments.

### III.

Plaintiff also claims that the statute is invalid on grounds of vagueness and overbreadth. Either of these doctrines, if applicable, would furnish an adequate and inde-

---

**10.** We note briefly certain other cases of peripheral relevance. *National Org. for Women v. Little League Baseball, Inc.,* 127 N.J.Super. 522, 318 A.2d 33 (1974), *aff'd mem.,* 67 N.J. 320, 338 A.2d 198 (1974), held that Little League baseball is a "place of public accommodation" within the meaning of N.J.Stat.Ann. § 10:5–12(f). No First Amendment or freedom-of-association argument was made, and the Court noted that the Little League could withdraw from New Jersey, if it wished, in order to avoid letting girls play baseball as well as boys. *B.P.O.E. Lodge No. 2043 v. Ingraham,* 297 A.2d 607 (Me.1972), *appeal dismissed for want of a substantial federal question,* 411 U.S. 924 (1973), upheld 17 Me.Rev.Stat.Ann. § 1301–A, forbidding racial discrimination by any person holding a liquor license or a license to serve food. The Maine court's opinion notes that the statute does not forbid discrimination in membership; it simply forbids the sale of liquor and food by those who do discriminate.

pendent basis for invalidating the public-accommodations law as applied to the membership practices of nongovernmental organizations, entirely apart from the invalid-as-applied ground described in Part II of this opinion. At first glance, the statute seems anything *but* vague in the present context. Whatever might have been its initial uncertainty as to the application of the phrase "place of public accommodation," and however startled it may be at that phrase's interpretation by the Supreme Court of Minnesota, the Jaycees now knows that it *is* a "place of public accommodation," and it knows precisely what its legal duties are under the Department of Human Rights' cease-and-desist order, and what the penal consequences may be of violating that order. But the Minnesota Supreme Court, in the course of interpreting the key statutory phrase, has, in our view, introduced such an element of uncertainty as to make it impossible for people of common intelligence to know whether their organizations are subject to the law or not.

■ The Supreme Court's opinion at first seems to include any large membership organization that aggressively recruits among a broad segment of people—a definition that probably is not vague, though it might raise overbreadth problems, in the sense that some clearly protected activities (*e.g.,* political parties) may be drawn within the zone of prohibition. (We take it, for example, that a single-issue political party devoted to either the passage or the defeat of the Equal Rights Amendment could assert a well-founded First Amendment right to limit its membership to one or the other sex.) The Supreme Court's opinion then seems to draw back from the full implications of its rationale. It explains that it is interpreting the law to apply only to "public" organizations—like the Jaycees—but not to "private" organizations—like the Kiwanis. Perhaps this passage in the opinion is evidence of the Court's solicitude for the rights of "private" groups, and of a desire to avoid an overbreadth challenge based on the theory that the law, even if valid as to the Jaycees, is invalid on its face because it applies to clearly protected private clubs.

An "overbroad" law may be challenged even by a plaintiff whose speech or conduct is not constitutionally protected, if it does not clearly distinguish between speech that is protected and speech that is not. *Cf. Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (Georgia "fighting words" statute invalid because it had not been authoritatively construed not to prohibit protected speech); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 508, 102 S.Ct. 1186, 1198, 71 L.Ed.2d 362 (1982) (White, J., concurring). The difficulty is that in attempting to limit the reach of the law to "public" groups, the state Supreme Court has left us without any discernible standard by which to distinguish "public" from "private." The opini·ń does not say what it is about the Kiwanis that makes it "private." It says only that the law applies to the Jaycees and not to the Kiwanis. All other groups are left to guess as to whether the law applies to them, and the Jaycees is left to guess as to how it might change itself in order to become "private."

■ The state answers that the Supreme Court of Minnesota did not really mean to hold that the Kiwanis is "private," and that in fact the record does not contain enough information about the Kiwanis to determine what its status is, or how it compares with the Jaycees. We do not so read the Supreme Court's opinion. The relevant passage, 305 N.W.2d at 771, seems clearly to say that the Kiwanis Club is "private" and therefore not subject to the law. The record is hardly full as to the Kiwanis Club and its activities, but the information it does contain seems rather to emphasize the similarities between the Kiwanis and the Jaycees, than the differences. The Kiwanis Club has about 300,000 members nationwide, in about 7,750 local chapters. 1 Gale, *Encyclopedia of Private Associations, supra,* at 783 (16th ed. 1981). It has as broad a range of activities as the Jaycees and competes for "the same class of members," except that the Kiwanis has no upper age

limit. Tr. 72.[11] Its membership requirements read as follows:

Section 4. *Active Membership*

a. The active membership of this club shall consist of men of good character and community standing residing or having other community interests within the area of this club.

b. The active membership of this club shall be composed of a cross section of those who are engaged in recognized lines of business, vocation, agriculture, institutional or professional life; or who having been so engaged, shall have retired. The number of members in any one given classification shall not exceed twenty percent (20%) of the total active membership.

c. No man shall be eligible to membership in this club who holds membership (other than honorary) in any other Kiwanis club or service club of like character.

d. An active member shall pay a membership fee and annual membership dues, and shall be entitled to all the privileges of this club.

At the oral argument the state suggested that membership in the Kiwanis Club is less broadly available than membership in the Jaycees. The language quoted from the By-Laws of the Kiwanis Club fails to demonstrate this claim to our satisfaction. The group of men from which Kiwanians are drawn may be just as numerous as the group from which Jaycees are drawn in practice, especially since there is no upper age limit in the Kiwanis Club. Perhaps Kiwanians do not recruit so aggressively as the Jaycees. We cannot be sure on this record. But the key point is that the Supreme Court's opinion does not identify the facts that served to distinguish the Kiwanis from the Jaycees in its mind, and therefore fails to supply any criterion for distinguishing "private" from "public" groups for purposes of the statute in question. The law, as construed by the Minnesota Supreme Court, simply provides no ascertainable standard for inclusion or exclusion, *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971), and is therefore void for vagueness. This conclusion is reinforced by the settled rule that the void-for-vagueness doctrine "demands a greater degree of specificity" in First Amendment cases than in other contexts. *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). It is true that the Jaycees knows now that, it is subject to the statute, because the highest state court has told it so. But it did not know it when the conduct now said to be illegal began, and it does not know now what it is that makes it "public," as contrasted with the "private" Kiwanis Club. A statute could perhaps be drafted that would adequately distinguish those categories, but this statute, as interpreted, does not.[12]

## IV.

We conclude that the Minnesota public-accommodations law, in the context of the membership practices of nongovernmental organizations, is invalid on two alternative and independent grounds: (1) it directly interferes with the Jaycees' First Amendment right of association without sufficient justification; and (2) it is void for vagueness because it supplies no ascertainable standard for the inclusion of some groups as "public" and the exclusion of others as "private." Our holding is a narrow one. The law will continue to apply with full vigor to all business and commercial activity in the usual sense of those words—to businesses, for example, that sell goods and services to the public. It will also apply to those nonmembership activities of the Jaycees and other groups that affect the public at large, including the sale of goods, the dispensing of charitable donations, the organization of sporting events, and the like. It is only the law's interference with an organization's choice of its own members that we hold

---

11. The reference is to the transcript of the trial before the District Court on August 3, 1981.

12. In view of our holding that the law is fatally vague, we do not reach plaintiff's claim of overbreadth.

invalid under the First and Fourteenth Amendments.

The judgment of the District Court is reversed, and the cause is remanded to that Court with directions to fashion injunctive relief in favor of the plaintiff consistent with this opinion.

It is so ordered.

LAY, Chief Judge, dissenting.

I respectfully dissent.

The attempt of the Jaycees to exclude women from their full membership seeks protection under what I consider to be an outdated rationale of our jurisprudence, one which relegated women to a status inferior to that of men.[1]

### I. *Right of Association.*

The majority decision is that the Jaycees' right of association cannot be made subordinate to the State of Minnesota's application of its civil rights act. This view I find to be totally untenable. The court acknowledges that it is within the state's prerogative to make the factual determination as to what may constitute a "place of public accommodation."[2] In all due respect, it seems patently clear, however, that the majority decision rests upon an implied disagreement with the finding of the Minnesota Supreme Court that the Jaycees is a statutory "place of public accommodation."[3] The majority's analysis is otherwise without much force.

It is true that "mere labels" cannot be used as subterfuge to undermine the proper exercise of constitutional rights. However, there should be little question that a state, as well as the federal government, may provide reasonable restrictions on the exercise of constitutional rights in a "place of public accommodation." *See, e.g.,* 42 U.S.C. § 2000a (1976). "Even a ' "significant interference" with protected rights of . . . association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976). The validity of substantial burdens on the right to associate is upheld when "they are necessary to further compelling state interests" and are "reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways." *American Party v. White,* 415 U.S. 767, 780–81, 94 S.Ct. 1296, 1305–1306, 39 L.Ed.2d 744 (1974).

The majority rests its decision on a balancing approach in which the state allegedly has failed to show that its interference with the Jaycees' right to associate is justified. I have great difficulty with the court's reasoning for several reasons.

First and foremost, the majority's conception of the Jaycees is based upon factual

1. *See, e.g., Hoyt v. Florida,* 368 U.S. 57, 61–62, 82 S.Ct. 159, 162, 7 L.Ed.2d 118 (1961) (Florida statute relieving women but not men from jury service not unconstitutional); *Goesaert v. Cleary,* 335 U.S. 464, 466, 69 S.Ct. 198, 199, 93 L.Ed. 163 (1948) (Michigan statute forbidding females to act as bartenders unless the wife or daughter of male owner not violative of equal protection); *Muller v. Oregon,* 208 U.S. 412, 421–22, 28 S.Ct. 324, 326–327, 52 L.Ed. 551 (1908) (state statute limiting females' workday to 10 hours a day not unconstitutional); *Cronin v. Adams,* 192 U.S. 108, 114–15, 24 S.Ct. 219, 220, 48 L.Ed. 365 (1904) (state may condition issuance of liquor license by prohibiting women from entering place where liquor is sold); *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 178, 22 L.Ed. 627 (1874) (fourteenth amendment does not confer right to vote on women); *Bradwell v. State,* 83 U.S. (16 Wall.) 130, 138–39, 21 L.Ed. 442 (1872) (federal constitution does not prohibit state from excluding women from the practice of law).

2. As Judge Arnold says, *supra,* at 1579:

   We of course take as a given that the Jaycees is a "place of public accommodation" within the meaning of the Minnesota statute. The Supreme Court of Minnesota has answered that question, and it has the last word. Its "construction fixes the meaning of the statute [and] . . . puts . . . words in the statute as definitely as if it had been so amended by the legislature." *Winters v. New York,* 333 U.S. 507, 514 [68 S.Ct. 665, 669, 92 L.Ed. 840] (1948).

3. This is made clear, for example, when the majority says: "The Jaycees may not be 'private' or 'social' in quite the sense that the *Runyon* Court used those terms ['private social organization'], but it comes closer to those categories than a school that holds itself out as willing to sell its services to any member of the public." *Supra,* at 1575.

error. The majority asserts, *supra*, at 1571, that a prohibition of the Jaycees' sexually discriminatory membership practices

> goes to the heart of the kind of association that plaintiff has had and desires to continue, an association for the advancement of the interests of young men.... It is natural to expect that an association containing both men and women will not be so single-minded about advancing men's interests as an association of men only.... An organization of young people, as opposed to young men ... will be substantially different from the Jaycees as it now exists.

Overlooked in recitation, however, is the fact that the Jaycees is not now an association containing only men. It freely admits women, but relegates them to inferior positions within the organization. Women who buy memberships participate in programs with the male members, but unlike men, they are not allowed to vote, hold office, or receive awards. *United States Jaycees v. McClure*, 305 N.W.2d 764, 765 (Minn.1981).

Moreover, the interests the Jaycees advance are not solely "young men's interests." A glance at the social, civic, and ideological activities of the Jaycees discussed in the majority opinion, *supra*, at 1569–1570, immediately discloses interests equally applicable to any state citizen, not just young men. The Jaycees operate on the arbitrary sentiment that men have a natural monopoly on such advocacies; this only serves to perpetuate the chauvinistic myth that women are incapable of dealing with such matters.

The majority proclaims that its holding "turns more on the presence of traditional First Amendment activity such as speech and advocacy of public causes, than on no-

tions of privacy or intimacy." *Supra,* at 1575. On this basis, the right of association pertaining to this "place of public accommodation" is elevated to override concededly compelling state interests.[4] Such bootstrapping lacks all potency, however, when the restriction the state seeks to apply does not create any threat to the exercise of the Jaycees' speech and advocacy of public causes. The activities the Jaycees engage in have no relationship to its internal membership practices; an association of men with privileges superior to women does not enhance the effectiveness of the type of advocacy the group has undertaken. *See NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). Thus, application of the statute to the Jaycees would not curtail or intimidate any advocacy the association has pursued. *See Runyon v. McCrary,* 427 U.S. 160, 176, 96 S.Ct. 2586, 2597, 49 L.Ed.2d 415 (1976); *Buckley v. Valeo,* 424 U.S. at 28–29, 96 S.Ct. at 639; *Lucido v. Cravath, Swaine & Moore,* 425 F.Supp. 123, 129 (S.D.N.Y.1977).

The majority does admit that "[m]en are no more likely than women" to favor certain political issues, but then proceeds to apparently ground its holding on a potential "change in the Jaycees' philosophical cast" since "[y]oung women may take a dim view of affirming the 'brotherhood of man'" or other such expressions contained in the Jaycees' creed. *Supra,* at 1571. Such a prediction, however, is unsupported by any factual basis. Many men as well as women believe women should be treated equally in accordance with men.[5] On the other hand, many women oppose certain advances in women's rights.[6] The speculative supposition that the Jaycees' creed "may" change if women are granted equal privileges is a

---

**4.** The majority also contends that it is unclear whether the Jaycees can avoid the effect of the Department of Human Rights' cease-and-desist order simply by withdrawing from the state. *Supra,* at 1572. I agree with the district court, however, 534 F.Supp. at 772, that the order must be construed according to its intent which was to require the Jaycees to do business in Minnesota in compliance with Minnesota law, if at all.

**5.** For example, many Jaycees' chapters, including the Minneapolis and St. Paul chapters, presumably with large male constituencies, have flouted the national organization's practices which are sexually discriminatory.

**6.** This posture is illustrated by the nation's struggles with the Equal Rights Amendment to the United States Constitution.

manifestly inadequate basis upon which to deprive the state from enforcing its overpowering interest within this sphere of public accommodations. *See Buckley v. Valeo,* 424 U.S. at 20–23, 25–29, 96 S.Ct. at 635–636, 637–639; *American Party v. White,* 415 U.S. at 790, 94 S.Ct. at 1310 (state regulation valid; "absolutely no factual basis" presented in support of claim of undue burden on first amendment rights regulation); *Konigsberg v. State Bar,* 366 U.S. 36, 51–53, 81 S.Ct. 997, 1007–1008, 6 L.Ed.2d 105 (1961); *American Communications Assn. v. Douds,* 339 U.S. 382, 396, 402–04, 406, 70 S.Ct. 674, 682, 685–686, 688, 94 L.Ed. 925 (1950); *Railway Mail Association v. Corsi,* 326 U.S. 88, 93–94, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945).

Furthermore, there is no claim or evidence, beyond the disputed membership practices, that any belief expressed in the Jaycees' creed is carried over into affirmative doctrinal advocacy that would be restrained by application of the state statute. The *belief* and the *advocacy* of the "brotherhood of man" and other male-oriented credos, even if intended to connote believed deficiencies of the female gender, would, if threatened, receive robust protection under the first amendment. However, the *conduct* or *practice* of discriminatory treatment in a "place of public accommodation" on the basis of illegal criteria cannot be safeguarded under an asserted constitutional right of association that has, at best, a hypothesized nexus to any deterrence of other protected first amendment rights. *See Runyon v. McCrary,* 427 U.S. at 176, 96 S.Ct. at 2597; *Railway Mail Association v. Corsi,* 326 U.S. at 93–94, 65 S.Ct. at 1487; *cf. Norwood v. Harrison,* 413 U.S. 455, 470 n. 10, 93 S.Ct. 2804, 2813 n. 10, 37 L.Ed.2d 723 (1973) (Court noted federal law barring discrimi-

nation in public accommodations, 42 U.S.C. § 2000a (1976)).

There should be little doubt that a sovereign has a compelling interest in eradicating second-class citizenship in places of public accommodation. The State of Minnesota has decreed that it is an unfair discriminatory practice "[t]o deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of . . . sex." Minn.Stat. § 363.03(3) (Supp.1982). The majority's constitutional argument would make sense if the Jaycees were a private membership organization possessing private associational characteristics. However, it has already been determined otherwise; the Jaycees is a "business . . . facility . . . whose goods, . . . privileges [and] advantages . . . are . . . sold, or otherwise made available to the public." 305 N.W.2d at 766–74; *see* Minn. Stat. § 363.01(18) (Supp.1982) (statutory definition of "place of public accommodation"). The legislative history and the evidence in the record clearly supports the legal and factual findings reached by the Minnesota court as to the Jaycees.[7] In any event, the court's determination of facts and state law are binding upon us in our task to determine the constitutionality of applying this state law to the Jaycees. *See NAACP v. Button,* 371 U.S. 415, 431–32, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963); *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 499–500, 61 S.Ct. 643, 644–645, 85 L.Ed. 971 (1941).

II. *Vagueness.*

The majority concludes that the Minnesota Supreme Court has provided no discernible standard for distinguishing "public" from "private" organizations. This conclu-

---

7. The Supreme Court of Minnesota resolved that the Jaycees is a *business* because its members are treated as customers; the product sold is membership in a leadership-training organization. 305 N.W.2d at 768–69. The court found that the Jaycees is a *public,* not private, business because the organization is unselective in those to whom it sells memberships, rewards vigorous recruitment, and strives for

unlimited growth. *Id.* at 769–71. The court furthermore decided that both the fixed site of the Jaycees' state headquarters and the mobile sites, including door-to-door solicitation of new members, constitutes public business *facilities* where an unscreened, unselected, and unlimited number of persons are invited. *Id.* at 771–74.

sion does not rest on the stipulated definition by the Minnesota Supreme Court of a "public" membership organization, which the majority concedes "probably is not vague," *supra*, at 1577, but on the unexplained comment in the state court opinion, 305 N.W.2d at 771, that the Jaycees could not "be viewed analogously to private organizations such as the Kiwanis International Organization."

The state determination that the Kiwanis is a "private" association is readily explainable, however, on the basis of the Kiwanis' membership requirements reported in the record and quoted in the majority opinion here. *See supra,* at 1578. The Minnesota court denotes as one criterion for the public-private distinction the use of standards in selecting new members and a formal procedure by which membership is restricted. The membership of the Kiwanis group is limited so that the number of members in any one given occupational classification cannot exceed 20% of the total active membership. Such a restriction circumscribes membership boundaries and would serve in itself to make the Kiwanis "private," unlike the Jaycees which has no limiting requirements except for age and sex.

The failure of the Minnesota court to identify specifically this difference between the Kiwanis and the Jaycees which is apparent in the record cannot justify invalidating the state statute as applied to membership organizations. A developed body of federal and state case law exists which analyzes various characteristics as public or private within the context of public accommodations statutes; the Minnesota court adopted these accepted standards from other courts for the criteria it employed to determine that the Jaycees' memberships are, in statutory terms, "made available to the public." *See* 305 N.W.2d at 770. Long usage as well as common understanding provides well-defined contours to the public-private distinction the Minnesota court

utilized. *See Grayned v. City of Rockford,* 408 U.S. 104, 110–12, 92 S.Ct. 2294, 2299–2301, 33 L.Ed.2d 222 (1972); *Law Students Civil Rights Research Council, Inc. v. Wadmond,* 401 U.S. 154, 159, 91 S.Ct. 720, 724, 27 L.Ed.2d 749 (1971); *cf. NAACP v. Button,* 371 U.S. at 434, 83 S.Ct. at 338 (state statute as construed by state court is invalid; statutory definition appeared to depart from common-law concept and state court did not clarify). If a statute can be made constitutionally definite by a reasonable construction, we have a duty to give the statute that construction, *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954); this same requirement should be equally applicable to the words of a state supreme court construing a state statute.[8] *See Winters v. New York,* 333 U.S. 507, 514, 68 S.Ct. 665, 669, 92 L.Ed. 840 (1948). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford,* 408 U.S. at 110, 92 S.Ct. at 2299. *See Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).

Moreover, even if the outermost boundaries of the public-private distinction is assumed to be imprecise, under accepted principles of constitutional adjudication, the Jaycees, who clearly fit within the definition of a "place of public accommodation," has no standing to challenge the vagueness of this statute as construed and applied to hypothetical organizations not before us. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974).

### III. *Overbreadth.*

The majority does not reach the overbreadth issue, but nevertheless insinuates invalidity on this basis of the state statute as construed. As an example that some

---

**8.** As in *United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 580, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973), it is significant that the state legislature has mandated the creation of advisory committees to disseminate technical assistance to interest-

ed persons. *See* Minn.Stat. § 363.05(17), (20), (21) (Supp.1982). To remove doubts as to the meaning of the law insofar as the state commission is concerned, advice can be sought on the validity of proposed courses of conduct.

protected activities may be prohibited, the majority alludes to the right of a single-issue political party, devoted to the passage or defeat of the Equal Rights Amendment, to limit its membership to one gender. *Supra,* at 1577. I fail to see how such an illustration is applicable to a statute aimed at "place[s] of public accommodation." Although a political party of this sort may be determined to be "public" under the selectivity and size criteria employed by the Minnesota court, such an association would not fit other requirements of a "place of public accommodation." The hypothetical political party would not be a business offering or selling goods, services, privileges, or advantages, nor could its characteristics possibly be harmonized with other categories within the Minnesota public accommodations law.

Because a statute declared to be overbroad cannot be enforced until narrowed, application of the doctrine is "strong medicine" and is to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. at 613, 93 S.Ct. at 2916. "[P]articularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2917. The potential effect of this statute on protected associational choices is mere speculation. *See id.; Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 462 n. 20, 98 S.Ct. 1912, 1922 n. 20, 56 L.Ed.2d 444 (1978). In such a situation, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick v. Oklahoma,* 413 U.S. at 615–16, 93 S.Ct. at 2917–2918.

In conclusion, I find the state statute as construed can be constitutionally applied to the discriminatory membership practices of the United States Jaycees, and is neither vague nor overbroad. I would affirm the decision of the district court.

HEANEY, Circuit Judge.

I would grant the petition for rehearing en banc.

The Minnesota Legislature decided that it would take permissible constitutional steps to eliminate discrimination in economic matters because of sex. To this end, it passed Minnesota Statute, Section 363.03(3) (1980), which makes it an unfair discriminatory practice to deny any person the full and equal enjoyment of the services, privileges and advantages of a place of public accommodation because of sex.

The Minnesota Department of Human Rights found that the United States Jaycees was a place of public accommodation within the meaning of the statute. It also found that the Jaycees had discriminated against women by denying them full membership in the organization. The Minnesota Supreme Court reached a similar conclusion. In so doing the Court noted that the Jaycees is a business organization whose primary aim is to advance the business careers of its members.

We should accept the public policy decision of the Minnesota Legislature and the holding of the Minnesota Supreme Court. Both are fully supported by the record.

Young women are entitled to share in the good jobs in our society according to their abilities. They will not share fully in these jobs, however, as long as young men are exclusively eligible for membership in the "right business organization," which gives them an edge in hiring for and promotion to leadership positions. To be sure, the Jaycees sponsor many social activities and events. They also take positions on some of the great issues of our time. But these activities are not central to their purpose. The central purpose is rather to learn the techniques and skills and to form the acquaintances that will serve as a basis for leadership positions today and tomorrow.

Young men have the right to associate with whomever they please, but under Minnesota law they should not be able to form an organization that is primarily business oriented and exclude young women from that organization when the effect of that exclusion is to deprive the latter of an equal opportunity for leadership positions.