UNITED STATES of America, Appellee,

v.

Janice FITZGERALD, Appellant.

No. 82–1242.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 2, 1983.

Decided Dec. 7, 1983.

Certiorari Denied April 23, 1984.
See 104 S.Ct. 2151.

Alan P. Caplan, Cleveland, Ohio, for appellant.

Ronald D. Lahners, U.S. Atty., D. Nebraska, Omaha, Neb., Robert J. Erickson, Attorney, Dept. of Justice, Washington, D.C., David A. Kubichek, Asst. U.S. Atty., Omaha, Neb., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, and BOWMAN, Circuit Judges.

BRIGHT, Circuit Judge.

A jury convicted Janice Fitzgerald and three codefendants of violating 18 U.S.C.

App. § 1202(a)(1) (possession by a convicted felon of a firearm in interstate commerce).[1] A three-judge panel of this court affirmed the convictions of the three codefendants, but on a divided vote reversed Fitzgerald's. *United States v. Apker,* 705 F.2d 293 (8th Cir.1983).

The United States petitioned for rehearing en banc, which this court granted, limited to the question whether firearms discovered in plain view during the course of a search pursuant to a federal search warrant, which warrant fails to describe some of the objects of the search with sufficient particularity, are admissible into evidence. We hold such firearms admissible, and affirm Fitzgerald's conviction. Except as to this issue, our decision en banc does not otherwise disturb the panel opinion in this case.

I. *Background.*

A grand jury indicted Fitzgerald and nine other persons, alleging that as members or associates of the Hells Angels they conspired to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Federal warrants issued authorizing the arrest of the indictees, and the search of their residences for various indicia of Hells Angels membership which would serve to establish their involvement in the alleged drug conspiracy.[2] Teams of federal and state law enforcement officers executed the arrest and search warrants early on the morning of February 28, 1981. At Fitzgerald's residence, the officers seized a Hells Angels T-shirt, a Hells Angels poster and medallions, a mirror bearing a Hells Angels sticker, a large number of photographs and photo albums, a telephone directory, and various other documents. They also seized three firearms: (1) a shotgun found in its case resting against the wall of a bedroom closet, (2) a pistol found in the pocket of a woman's coat hanging in the closet, and (3) a rifle found "behind a dresser drawer." These firearms supplied the basis for Fitzgerald's subsequent indictment and conviction under section 1202(a)(1), from which conviction she now appeals.

The three-judge panel which initially considered the appeal of Fitzgerald and her codefendants held the search warrants invalid on the ground that they failed to describe some of the objects of the search with sufficient particularity. Specifically, the panel determined that the warrant provisions authorizing the seizure of Hells Angels membership directories and "papers relating to Club activities" were too broad to satisfy the "scrupulous exactitude" standard which applies to warrants impinging on first amendment interests. *See United States v. Apker, supra,* 705 F.2d 293, 299–303. The invalidity of those portions of the warrants is not at issue here. But the panel also held that the portions of the warrants describing jackets, belt buckles, T-shirts, photographs, and plaques and mirrors satisfied the scrupulous exactitude requirement. *Id.* at 302–03. The precise issue before the court on this rehearing is whether the invalidity of certain portions of the warrants renders the warrants wholly invalid, as the panel majority held, or

---

1. The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska, presided at trial.

2. The search warrants authorized the search and seizure of the following items:
 A. Sleeveless leather and jean jackets with a Death's Head insignia with wings on the back with the notation "Hell's Angels" written above the Death's Head and the state that the party is a member of, in this case Nebraska, is written beneath the Death's Head symbol (commonly and hereafter referred to as "Hell's Angel's Colors").
 B. A metal belt buckle which states "Hell's Angels" on it.
 C. Certain plaques, mirrors and other items which give the names of members of the Hell's Angels.
 D. Photographs which depict the association of members of the Hell's Angels.
 E. Telephone books with telephone numbers listed therein of members of the Hell's Angels, which includes local and national members.
 F. Certain papers relating to Club activities, expenditures, financial records, Club rules and regulations.
 G. Red T-shirts with "Hell's Angels" printed on them.

whether, rather, the insufficiently particular portions of the warrant can be severed from the rest, leaving the warrant intact apart from the severed portions.

For the reasons set forth below, we adopt the severance approach, and hold the warrants valid as to those portions which authorized a search for particular items, *i.e.*, certain articles of clothing, belt buckles, plaques and mirrors, and photographs tending to show association with the Hells Angels. Because the warrants as redacted were valid, the police possessed authority under the "plain view" doctrine, *see Texas v. Brown,* —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), and *Coolidge v. New Hampshire,* 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971), to seize any apparent contraband or evidence of a crime they might inadvertently find while executing the valid portions of the warrant. On the record before us, it appears clear that the officers discovered the shotgun in Fitzgerald's closet in plain view during the search for clothing carrying insignia of the Hells Angels. Because the shotgun seized during execution of the valid portions of the warrant suffices to support Fitzgerald's conviction under section 1202(a)(1), we affirm that conviction.

## II. *Discussion.*

■ The prime purpose of the rule excluding evidence seized in violation of the fourth amendment is the deterrence of future unlawful police conduct. *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). Additionally, the rule serves to protect courts from any taint-by-association with police misconduct, and prevents the prosecution from benefiting from unconstitutional po-

lice activity. *See United States v. Cook,* 657 F.2d 730, 734 (5th Cir.1981). In deciding whether particular evidence should be suppressed in any given case, then, courts properly weigh the deterrent effect of the suppression against its societal costs. *See, e.g., United States v. Janis,* 428 U.S. 433, 453–54, 457–58, 96 S.Ct. 3021, 3031–32, 3033–34, 49 L.Ed.2d 1046 (1976). Where little or no deterrence will result from suppression, suppression is inappropriate, for where the reason for the rule ceases, its application also must cease.

■ Here, then, we consider whether suppressing the firearms seized in Fitzgerald's bedroom would advance the purposes which animate the exclusionary rule. First, we observe that the law enforcement officials in this case sought and obtained arrest and search warrants from a magistrate. The magistrate, the district court, and the three-judge panel of this court all concluded that the police had probable cause to search Fitzgerald's residence. Five of the seven clauses of the search warrant met the particularity requirement in describing the objects of the search; the other two were subsequently held deficient only in that they failed to satisfy the "scrupulous exactitude" test. Nothing in the record suggests that the officers or the magistrate did not believe themselves to be according the indictees' constitutional rights the full respect they merit. Under these circumstances, we do not think it would advance the purposes behind the exclusionary rule to exclude *all* that the officers seized in Fitzgerald's residence, merely because the warrant was in one respect deficient. Accordingly, we follow the approach which the First, Third, Fifth, Sixth, and Ninth Circuits,[3] and several states,[4] have adopted, and hold that, ab-

---

**3.** *See United States v. Riggs,* 690 F.2d 298 (1st Cir.1982) (adopting severance); *United States v. Christine,* 687 F.2d 749 (3d Cir.1982) (adopting severance); *United States v. Cook, supra,* 657 F.2d 730, 734–36 (5th Cir.1981) (adopting severance); *United States v. Freeman,* 685 F.2d 942, 952–53 (5th Cir.1982) (admitting evidence discovered in plain view during execution of the valid portions of a severed warrant); *Sovereign News Co. v. United States,* 690 F.2d 569, 576 (6th Cir.1982) (adopting severance), *cert.*

denied, —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Cardwell,* 680 F.2d 75 (9th Cir.1982) (endorsing the severance approach but holding the warrant in question not susceptible of severance).

**4.** *See, e.g., Aday v. Superior Court,* 55 Cal.2d 789, 13 Cal.Rptr. 415, 362 P.2d 47 (1961) (admitting items seized pursuant to valid portions of warrant, other portions of which were insufficiently particular). *See also United States v.*

sent a showing of pretext or bad faith on the part of the police or the prosecution, the invalidity of part of a search warrant does not require the suppression of all the evidence seized during its execution. More precisely, we hold that the infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant (assuming such evidence could not otherwise have been seized, as for example on plain-view grounds during the execution of the valid portions of the warrant), but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized—on plain-view grounds, for example—during their execution). This approach, we think, complies with the requirements of the fourth amendment.

■ We recognize the dangers which would attend on this approach were it carelessly administered. The police might be tempted to frame warrants in general terms, adding a few specific clauses in the hope that under the protection of those clauses they could engage in general rummaging through the premises and then contend that any incriminating evidence they recovered was found in plain view during the search for the particularly-described items. We believe, however, that careful administration of the rule will afford full protection to individual rights. First, magistrates must exercise vigilance to detect pretext and bad faith on the part of law enforcement officials. Second, courts should rigorously apply the exclusionary rule to evidence seized pursuant to the invalid portions of the warrant. Third, items not described in the sufficiently particular portions of the warrant will not be admissible unless it appears that (a) the police found the item in a place where one would reasonably have expected them to look in the process of searching for the objects described in the sufficiently particular portions of the warrant, (b) the police found the item before they found all the objects described in the sufficiently particular portions of the warrant (that is, before their

*Giresi,* 488 F.Supp. 445, 459 n. 17 (D.N.J.1980)

lawful authority to search expired), and (c) the other requirements of the plain view rule—inadvertent discovery and probable cause to associate the item with criminal activity—are met.

## III. *Conclusion.*

■ Applying these standards to Fitzgerald's case, we conclude that at least one of the weapons introduced against her was properly received into evidence. The valid portions of the warrant authorized the officers to search for, among other things, certain jackets, T-shirts, and belt buckles. The officers would reasonably have looked in the bedroom closet for these items, and it was there, in plain view, that they found the shotgun. The officers never found a Hells Angels belt buckle or jacket at Fitzgerald's residence, so their discovery of the shotgun occurred before the expiration of their authority under the warrant to search for particularly-described items. Because the record reflects neither pretext, bad faith, nor lack of inadvertence on the officers' part, the district court properly admitted the shotgun into evidence.

The pistol, on the other hand, is not admissible. We do not think the police had reason to search the pockets of an ordinary overcoat while looking, pursuant to the valid portions of the warrant, for Hells Angels insignia. Likewise, the record relating to the discovery of the rifle fails to disclose sufficient information to permit us to conclude that the officers discovered it in plain view during the execution of the valid portions of the warrant. We know that the police discovered the rifle "behind a dresser drawer," but not why they were looking there. But because possession of one weapon is enough to support a conviction under section 1202(a)(1), it is not necessary to determine whether the rifle is admissible. In the context of this case, moreover, the trial court's admission of the pistol and the rifle into evidence must be deemed harmless error.

(collecting state cases).

The conviction is affirmed.[5]

FLOYD R. GIBSON, Senior Circuit Judge, concurring in the result.

While I concur in the result upholding Fitzgerald's conviction based upon the admission of the guns seized from her residence, I would reach that result by applying the widely adopted inevitable discovery exception to the exclusionary rule. Although the record shows the guns were actually seized pursuant to the partially invalid federal search warrant, they were nevertheless admissible against Fitzgerald because they could have been discovered while the officers were executing the valid state search warrant authorizing the search of Fitzgerald's residence for suspected controlled substances.

In the original panel opinion, I applied the inevitable discovery exception to uphold the convictions of Apker, Davenport, and Gearhart, finding that the guns admitted against them could have been discovered pursuant to independently obtained valid state search warrants authorizing the search of their residences for "suspected controlled substances." In Fitzgerald's case, however, I refrained from applying the inevitable discovery exception to permit the admission of the guns discovered at her residence, finding no evidence of an independent state search warrant for her residence. See *United States v. Apker,* 705 F.2d at 306–07.

Upon reviewing the record again, I realized that there was a valid state search warrant authorizing the search for drugs at Fitzgerald's residence (Government exhibit # 7). The state search warrant was based upon Omaha Narcotics Officer Tomschecks' observation of suspected controlled substances shortly after he and three other officers arrived at Fitzgerald's residence to execute the federal arrest and search warrants. In his affidavit in support of the state search warrant, Officer Tomscheck stated that while he was serving the "Federal Search Warrant", he observed "one metal vial containing suspected cocaine residue and one cocaine metal tooter" on the top of a bedstand in Fitzgerald's bedroom. At the suppression hearing, Tomscheck testified that he first observed the vial and tooter on the bedstand while he was conducting a "sweep search" (i.e., a search for persons who might present a security risk) incident to the execution of the federal arrest warrant. (See suppression hearing transcript 65–68).

The validity of the state search warrant, and hence the propriety of admitting the guns under the inevitable discovery exception, depends upon whether Tomscheck saw the suspected cocaine residue while conducting the legitimate sweep search incident to the arrest or while executing the partially invalid federal indicia search warrant.[*] If Officer Tomscheck had seen the suspected cocaine residue during the sweep search, then the state search warrant would have been valid and the guns would have been admissible under the inevitable discovery exception. See *Apker,* 705 F.2d at 306–07. However, if he had seen these items while executing the invalid federal indicia search warrant, the state search warrant would have been invalid as "the

---

**5.** Chief Judge Lay joins this opinion in its entirety. Judges Ross, Arnold, John R. Gibson, Fagg, and Bowman join in all but Part III. of this opinion, and concur in the affirmance. Judge Floyd R. Gibson concurs in the result only, for the reasons set forth in his separate opinion.

\* Under the majority's plain view-severance approach, this inquiry would be of academic interest only. First, the plain view-severance approach justifies the eventual seizure of the guns regardless of the validity of the state search warrant. Second, even considering the validity of state search warrant, the officer's plain view observations would provide a valid basis for the issuance of the state search warrant for drugs regardless of whether those observations were made during the execution of the valid federal arrest warrant or during the execution of the partially invalid federal search warrant. Since Officer Tomscheck clearly observed the suspected cocaine residue "in a place where one would reasonably have expected [him] to look in the process of searching for the objects described in the sufficiently particular portions of the [indicia] warrant", (at 637) the state search warrant would not be the fruit of any poisonous tree.

fruit of the poisonous tree"—the poisonous tree being the invalid federal search warrant.

The district judge's findings on the validity of the state search warrant are instructive. The trial judge initially concluded that the state search warrants for all of the defendant's residences were not the "fruit of the poisonous tree" because the federal indicia search warrants were valid. (Designated Record at 40). He then alternatively found that even if the federal search warrants were invalid, the state search warrants, including the one issued for Fitzgerald's residence, were still valid because they were based upon the observation of "suspected controlled substances" during the course of sweep searches incident to the execution of the arrest warrants. (Des.Rec. at 40 n. 2). Officer Tomschecks' suppression hearing testimony supports this finding as it applies to Fitzgerald's case. (SH 65–68). Moreover, it is certainly reasonable to infer that Tomscheck could have observed the suspected cocaine residue on the top of the bedstand while he was conducting a legitimate sweep search of Fitzgerald's bedroom.

Thus, because the state search warrant for Fitzgerald's residence was valid, being based upon Tomschecks' plain view observation during the legitimate sweep search, the three guns found in Fitzgerald's apartment would be admissible under the inevitable discovery exception to the exclusionary rule. My conclusion here is of course based upon the assumption that the officers would have discovered all three guns while they were searching for controlled substances under the valid state search warrant. I would therefore affirm Fitzgerald's conviction without applying the plain view-severance approach to the partially invalid indicia warrants.

ARNOLD, Circuit Judge, concurring, with whom ROSS, JOHN R. GIBSON, FAGG, and BOWMAN, Circuit Judges, join.

For the reasons so ably stated by the Court, I agree that the plain view-severance approach is proper, that the shotgun was validly seized, and that the conviction should be affirmed. I do not join Part III. of the lead opinion, however, because in my view the pistol and the rifle were also validly discovered and seized. A belt buckle could have been found in an overcoat pocket, or behind a dresser drawer. It was therefore wholly proper for the officers executing the warrant to be looking in those places.

I also wish to emphasize that the Court en banc is not holding that the Hell's Angels have a First Amendment right of association, or that any clause in this warrant was not particular enough in its description of the articles to be seized. Those conclusions were reached by the panel, but they were not referred to the Court en banc for its review. The right-of-association question especially gives me pause. Presumably no one would argue that there is a First Amendment right to ride a motorcycle. Whether the First Amendment nonetheless guarantees the right of two or more people to ride motorcycles in groups, is a question much more doubtful than the panel opinion implies. No one contends that the Hell's Angels petition Congress for redress of grievances, or advocate ideas or doctrines, so far as I know. Whatever right of association they have, then, probably is an aspect of that "liberty" which the Due Process Clause seems to protect against arbitrary or irrational governmental action, rather than a right entitled to the more expansive protection of the First Amendment, which forbids reasonable as well as unreasonable attempts by Congress to abridge the freedom of speech. "It may be ... that association for ends specifically mentioned in the First Amendment will prevail against all state interests not regarded as 'compelling,' while other kinds of association ... would be protected not by the specific guarantees of the Bill of Rights, but by the more nebulous concept of substantive due process, an oxymoron if there ever was one." *United States Jaycees v. McClure,* 709 F.2d 1560, 1568 (8th Cir.1983) (footnote omitted).

The panel opinion holds that the Hell's Angels is an association protected by the

First Amendment. Since the Court en banc, as I read its opinion, does not reach that question, but simply takes the panel's conclusion as a given for purposes of analysis, it is not necessary for me to pursue the issue.

HEANEY, Circuit Judge, dissenting, with whom McMILLIAN, Circuit Judge, joins.

I respectfully dissent. The search of Janice Fitzgerald's home was unreasonable under the circumstances and not supported by probable cause. It in reality was nothing more than a fishing expedition. We should suppress the evidence seized without hesitation.

The interpretative case law today surrounding the fourth amendment tends to obscure the amendment's simple prohibition against *unreasonable* searches and seizures. This reasonableness standard is not capable of precise definition or mechanical application, but depends upon the circumstances of each case. *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam); *Chimel v. California,* 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1968); *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). In considering the circumstances, we must remember that the right to privacy is "basic to a free society." *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). We must examine "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

Fourth amendment protection is strongest at the threshold of the private home. As the Supreme Court recently reaffirmed:

The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "the right of people to be secure in their * * * houses * * * shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734.

*Payton v. New York,* 445 U.S. 573, 589–590, 100 S.Ct. 1373, 1381–1382, 63 L.Ed.2d 639 (1980).

Undeniably, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972), *quoted in Payton v. New York, supra,* 445 U.S. at 585, 100 S.Ct. at 1379; *Coolidge v. New Hampshire,* 403 U.S. 443, 474, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971).

The totality of the circumstances here compels the decision that the search of Fitzgerald's home was unreasonable. First, the circumstances leading up to the search indicate the indicia warrant was a pretext for a general search. The affidavit for the search warrant did not contain any information indicating that drugs or weapons would be found in Fitzgerald's home. Yet, the morning of the search, teams of law enforcement officers from the United States Attorney's Office, the United States Bureau of Alcohol, Tobacco and Firearms, the United States Drug Enforcement Agency, the Nebraska State Patrol, the Douglas County Sheriff's Office and the Omaha Police Department met at the Omaha Police Department. There, various local and federal officers addressed them concerning the execution of the search and arrest warrants. Those present at the briefing were told they could look everywhere in the suspects' residences and to be on the lookout for guns and drugs. In the event an officer observed these items, a magistrate, typist, and other law enforcement personnel were standing by ready to quickly issue state search warrants. The only basis for instructing the officers in this manner was

the hope that the thorough search authorized by the indicia warrants would turn up guns and drugs which the courts would later rule admissible under the plain view exception.

Second, the law enforcement officers had little need for the indicia evidence they ostensibly sought. Indicia of membership in the Hell's Angels could provide only circumstantial evidence of the association element of conspiracy.[1] Moreover, the authorities already had some circumstantial evidence of Fitzgerald's association with Hell's Angels members. The affidavit for the search warrant recites that Fitzgerald is the widow of a Hell's Angels member. Law enforcement officers observed her at her husband's traditional Hell's Angels funeral. In fact, Fitzgerald had gone to the police property unit of the Omaha Police Department after her husband's death to retrieve his property, including a Hell's Angels ring and belt buckle. The minimal probative value of the indicia evidence, together with the fact that the government already had evidence of Fitzgerald's association with the Hell's Angels, bolsters the conclusion that the indicia warrant provided a pretext for a general search.

Finally, the affidavit for the search warrant recited no facts which would permit either the neutral magistrate who issued the warrant or any reviewing court to determine whether there was probable cause to believe Fitzgerald was involved in an illegal drug conspiracy. The affidavit incorporates the grand jury indictment which names ten defendants. The indictment states that nine of these defendants are members of the Hell's Angels and that "Defendant Janice Fitzgerald was and is an Associate of the Hell's Angels by reason of her marriage to Leslie Fitzgerald, a deceased member of the Hell's Angels, and by reason of her participation in the activities of the Hell's Angels during the period of this conspiracy." According to the indictment, the Hell's Angels organization, including the defendants, is attempting to monopolize methamphetamine distribution in the Omaha, Nebraska, vicinity. All of the acts alleged pertain to the entire organization; the indictment does not specify a single act by Fitzgerald in furtherance of the conspiracy. The only additional information the affidavit for the search warrant adds is the affiant's reasons for believing indicia of membership in the Hell's Angels would be found in the suspects' homes. Since the minutes of the grand jury are secret, the magistrate and this Court must accept on faith the existence of evidence linking Fitzgerald to the drug conspiracy.[2] The impossibility of reviewing the probable cause determination, added to the previously cited factors, makes this search unreasonable.

In sum, a review of the facts leads to the inescapable conclusion that the law enforcement officers were seeking an excuse to execute a general search of Fitzgerald's home. A sealed grand jury indictment, an indicia warrant of doubtful necessity and a conscious resort to the plain view exception provided the excuse. While the outcome of Fitzgerald's trial on the conspiracy count is

---

1. As the majority panel notes, police can search for "mere evidence" of a crime if there is a nexus between the item to be seized and criminal behavior. *United States v. Apker,* 705 F.2d 293 (8th Cir.1983), citing with approval *Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). In other words, there must be probable cause to believe the evidence sought will aid in the particular apprehension or conviction. *Id.* I do not agree that evidence of membership in a legal organization helps prove a particular defendant conspired with others to commit an illegal act. In Fitzgerald's case, the Hell's Angels indicia in her home could only prove what the police already knew: that she is the widow of a Hell's Angel. I would strike down the search warrant

because the police had no legitimate reason for searching Fitzgerald's home for Hell's Angels indicia.

2. I do not agree with the majority panel opinion that the incorporation of the indictment into the affidavit for a search warrant provided probable cause to believe, for fourth amendment purposes, that Fitzgerald was engaged in criminal activity. While a grand jury indictment, without more, provides probable cause for an arrest warrant, this rule should not be extended to search warrants. *See* Thompson, C., *The Fourth Amendment Function of the Grand Jury,* 37 Ohio L.J. 727 (1976).

not relevant to the probable cause determination, I cannot help but note that after months of preparation and weeks of trial, the government could not produce enough evidence to go to the jury on the conspiracy charge. The government could only prove firearm possession violations with evidence bootstrapped into the trial through the plain view exception. I do not think the government should be allowed to succeed in this conscious violation of the fourth amendment protection against the general search. I would therefore reverse Janice Fitzgerald's conviction.