United States Court of Appeals

For the Eighth Circuit

_____

No. 18-2154

_____

United States of America,

*Plaintiff - Appellee,*

v.

Rodolfo Anguiano, Jr.,

*Defendant - Appellant.*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: July 15, 2019
Filed: August 20, 2019

_____

Before LOKEN, COLLOTON, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

After Rodolfo Anguiano, Jr., was indicted on drug charges, he moved to suppress evidence on the ground that his arrest and subsequent searches of his hotel room and vehicle violated his rights under the Fourth Amendment. The district court[1]

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

granted the motion in part, but ruled that some methamphetamine seized during the searches was admissible.  Anguiano entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress.  Considering that appeal, we affirm.

I.

The investigation began when police officer Jacob Gruber noticed a red Volkswagen Jetta pull into a Days Inn parking lot in Bloomington, Minnesota.  He ran a check on the car's California license plates and discovered that the vehicle's registration had expired.  Gruber followed the car when it left the hotel and conducted a traffic stop when the driver committed a lane violation.

Gruber approached the vehicle and saw Anguiano sitting in the driver's seat.  He noticed an "overwhelming odor of air fresheners" and saw "dryer sheets all over the floor in the back and the front" of the car.  He perceived the dryer sheets to be "an indicator of possible drug activity," because "[t]hey are commonly used to cover up the odor of large amounts of narcotics."

Gruber's suspicions were heightened after he spoke with the driver.  Anguiano said that he had been in the area for three days for a cousin's wedding, but did not know the wedding's location; he had switched from one hotel to another during his brief stay; and he said that the car was already in Minnesota before he arrived because his cousin had driven it from California.  Gruber knew from his training that drug traffickers often "pay somebody to drive their load car to a location and then . . . fly there and retake possession."  Gruber checked Anguiano's criminal history and found prior arrests for "alien smuggling, controlled substance and . . . possession of pills," but when he asked Anguiano about prior arrests, Anguiano replied that he had "never been in trouble for drugs."

-2-

Anguiano declined to provide consent to search his vehicle, so Gruber had another officer lead a drug-sniffing dog around the exterior. Although the animal was "interested" in the undercarriage of the vehicle, the dog did not alert. Gruber decided that there was insufficient evidence to make an arrest, so he returned Anguiano's license to him. When Anguiano put his license in his wallet, Gruber saw that Anguiano possessed multiple credit cards and a badge bearing the acronym for the Drug Enforcement Administration. At that point, Gruber believed he had probable cause to arrest Anguiano for fraudulent financial transactions and placed him in custody.

After the arrest, officers traveled to the hotel where Anguiano said he was staying and knocked on the door of the room registered to him. Zyaira Gavino answered the door and permitted the officers to enter. Once inside, officers saw Kelvin Baez sitting on the living room couch and noticed a methamphetamine pipe on a table beside him. Gavino told the officers that she and Baez had stayed at the hotel for a few days with a friend whom they knew only as "Bebe."

Gavino gave the officers consent to search the hotel room, as well as a suitcase, backpack, and some shopping bags in the room. In the backpack, Gruber found an owner's manual to a Chevy Equinox; he believed that the manual was consistent with a set of car keys that he saw on the living room couch.

The officers entered the back bedroom and saw a padlocked armoire. They observed a cellular telephone that was positioned to make a video recording of the armoire and activity around it. They also saw pound-size packaging materials in an open-top garbage can. Gruber asked Baez where any narcotics in the room would be located, and Baez responded, "in the armoire, obviously."

Officers brought a drug-sniffing dog to the room, and the dog alerted at the locked armoire and a dresser in the back bedroom. The dog also alerted at a Chevy

Equinox in the hotel parking lot. Gruber then searched the bathroom, "popped off" a panel from a bathroom sink vanity, and found methamphetamine. The officers arrested Gavino and Baez, secured the scene, and sought a warrant to search the hotel room and Chevy Equinox. After obtaining the warrant, the officers searched the secured armoire and the vehicle and found methamphetamine in both places.

Anguiano was charged with conspiracy to possess with intent to distribute methamphetamine and possession with intent to distribute the same. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846. He moved to suppress evidence discovered during the traffic stop, his arrest, and the subsequent search of his hotel room and the Chevy Equinox.

The district court ruled that Anguiano's arrest at the scene of the traffic stop was not supported by probable cause, and that once Gruber saw the padlocked armoire, he could not reasonably believe that Gavino had authority to consent to a search of the back bedroom and bathroom sink. As to the armoire and the Chevy Equinox, however, the court ruled that the searches were conducted pursuant to a facially valid search warrant, and that the drugs found there were admissible. The court concluded that "even without the suspected methamphetamine from under the sink," the facts in the search warrant application "cumulatively clear the threshold to establish probable cause to support a search warrant for Room 714 and the Chevy Equinox."

Anguiano conditionally pleaded guilty to the substantive count of methamphetamine trafficking, and the government dismissed the conspiracy count. The district court sentenced him to 132 months' imprisonment. Anguiano now appeals the partial denial of his motion to suppress.

II.

Anguiano challenges the district court's ruling that methamphetamine found in the armoire and the Chevy Equinox was admissible at trial. The government defends the district court's ruling as a proper application of the independent source doctrine.

The independent source doctrine allows admission of "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988). To invoke this rule, the government must show "(1) that the decision to seek the warrant was independent of the unlawful entry—i.e., that police would have sought the warrant even if the initial entry had not occurred—and (2) that the information obtained through the unlawful entry did not affect the magistrate's decision to issue the warrant." *United States v. Khabeer*, 410 F.3d 477, 483 (8th Cir. 2005). We review the district court's finding on the first issue for clear error and the conclusion on the second point *de novo*. *See United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013).

The district court's original order denying the motion to suppress addressed only the second issue—that is, whether the warrant was supported by probable cause even without information gained from the illegal search. Because the court had not addressed whether investigators would have sought a warrant even if the initial search had not occurred, we remanded for the district court to make the requisite factual finding. The court then found that "the only plausible conclusion to be drawn from the record is that the officers would have sought a search warrant even if they had not found the methamphetamine in the vanity." We received supplemental briefs and now consider the appeal.

-5-

Anguiano argues that the district court clearly erred in finding that police would have sought a warrant without the illegal search. He cites Officer Gruber's testimony that "once there's a reason to arrest somebody . . . we generally get a warrant to shore things up." According to Anguiano, this statement means that the officers would not have sought a warrant unless they were going to arrest someone, and they were not in a position to arrest anyone at the hotel until they conducted the illegal search. Gruber did not say, however, that he seeks a search warrant *only* when he has probable cause to make an arrest. He testified he obtained the warrant in this case after discovering drugs in order "to shore things up, make sure there [were] no mistakes made." But his statement did not address what officers *would have done* if Gavino had declined to consent to a search of the bathroom in the first place. Gruber's testimony is not inconsistent with the court's finding that the officers would have sought a warrant even without the illegal search.

The evidence taken as a whole provides ample support for the district court's finding. The officers at the hotel encountered suspicious circumstances that gave reason to believe there were drugs in the armoire: occupants of Anguiano's room claimed that they had stayed a couple of days but did not know Anguiano's name; there was a methamphetamine pipe visible on a table and packaging material for larger quantities in a trash can; and the armoire was padlocked with cell phone video surveillance. The court credited Gruber's testimony that if Gavino had not consented to a search of the room, then he "would have froze[n] the room and called for a search warrant . . . based on what we saw." Two other officers testified that officers typically would seek a warrant before breaking a lock like the one on the armoire. Under those circumstances, the district court thought "the officers would have been derelict in their duty to investigate had they not sought a search warrant." At a minimum, it was not clearly erroneous to find that they would have applied for a warrant even if Gavino had refused consent.

-6-

There was also probable cause to support issuance of the search warrant even without information gleaned from the initial search. The affidavit detailed the suspicious circumstances surrounding Anguiano's trip to Minnesota, including the quantity of dryer sheets in the car, the fact that he claimed to be in town for a wedding without knowing any details about the event, and that he flew from California while his cousin drove his car separately. The submission explained that Anguiano had prior drug arrests and possessed a badge marked with "DEA." The affidavit recounted that in the hotel room where Anguiano was staying, officers saw a methamphetamine pipe, a key and manual for a Chevy Equinox, an armoire that was padlocked, and pound packaging materials in a garbage can. The declaration also explained that a canine positively alerted at the Chevy Equinox parked at the hotel. Even if there were innocent explanations for some of these facts when viewed in isolation, the combination of circumstances justified issuance of a warrant. The information sufficed to establish a fair probability that evidence of drug trafficking would be found in the hotel room. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

\*     \*     \*

The judgment of the district court is affirmed.

_____