# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2823

_____

United States of America

*Plaintiff - Appellee*

v.

Kelvin Baez

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 21, 2020
Filed: December 29, 2020

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Kelvin Baez was indicted for conspiracy to distribute methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, conspiracy to possess firearms in furtherance of drug trafficking, 18 U.S.C. § 924(c), and possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), (b)(1)(A).  After a jury found Baez guilty

on all three counts, the district court[1] sentenced him to 168 months' imprisonment. Baez appeals, raising several challenges to his conviction and sentence. We affirm.

**I.**

From September 2016 to May 2017, Baez distributed methamphetamine as part of a drug-trafficking conspiracy in Minnesota. On May 5, 2017, Officer Jacob Gruber stopped another member of the conspiracy, Rodolfo Anguiano, for expired license plates. Officer Gruber arrested Anguiano upon seeing numerous dryer sheets on the floor of his car as well as a fake Drug Enforcement Administration ("DEA") badge and more than ten credit cards in his wallet. A search of the car revealed large wads of cash and additional credit cards in different names.

Joined by two other officers, Officer Gruber proceeded to the hotel suite where Anguiano was staying. One of the officers knocked on the door. Baez's wife, Zyaira Gavino, opened the door and waved in the officers when they requested permission to enter. Baez was sitting in the front room of the suite next to Chevrolet keys and a methamphetamine pipe. The officers asked Gavino's consent to search "the room," which she granted, gesturing to some bags in the front room. In a backpack between Gavino and Baez, the officers found a Chevrolet Equinox owner's manual. After searching the front room of the suite, the officers proceeded through an open door to the back room and saw a locked armoire that appeared to be under cell-phone video surveillance. The officers called for a canine unit, which alerted at the armoire and at an Equinox in the hotel parking lot that flashed its lights when an officer pressed the unlock and lock buttons on the Chevrolet keys. Officer Gruber searched the rest of the back room and discovered two large bags of methamphetamine hidden under a sink.

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

At that point, Officer Gruber arrested Gavino and Baez. The officers obtained a warrant to search the hotel suite and the Equinox. In the armoire, they discovered methamphetamine and a firearm. In the Equinox, they discovered methamphetamine, another firearm, and a safe with ammunition as well as receipts in Baez's name. The next day, Baez made incriminating statements while in custody.

Baez and some of his coconspirators, including Anguiano, were indicted over the next several months. After pleading guilty, Anguiano unsuccessfully appealed the district court's denial of his motion to suppress evidence obtained from the searches of the armoire and the Equinox. *See United States v. Anguiano*, 934 F.3d 871 (8th Cir. 2019). The district court also denied Baez's motions to suppress the evidence found in the back room, the evidence found in the safe in the Equinox, and the incriminating statements that he made while in custody.

Baez was the only defendant among the conspirators not to plead guilty. At trial, he advanced an "innocent-intent" defense, claiming that he was infiltrating the drug-trafficking conspiracy with the intention of assisting law enforcement. To bolster this defense, Baez sought to introduce evidence regarding his mental health and a potential informant with whom he had been acquainted when he lived in North Carolina. In addition, Baez moved to compel the Government to disclose information about the potential informant pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The district court excluded the evidence that Baez sought to introduce and only partially granted his *Brady* motion. The district court declined Baez's request to instruct the jury that it would "negate[] the specific intent required by the charges" if Baez intended to "assist ongoing federal investigations" and believed that "his actions were not criminal."

The jury convicted Baez on all three counts charged in the indictment. At sentencing, the district court concluded that Baez's criminal history was overstated and departed downward from the guidelines, settling on a criminal-history category of III instead of a criminal-history category of V. Because Baez's offense level was

40, this resulted in an advisory sentencing guidelines range of 360 months' to life imprisonment. The district court then proceeded to vary downward by more than fifty percent, sentencing Baez to 168 months' imprisonment.

Baez appeals, challenging the denial of his suppression motions, the district court's failure to instruct the jury on his "innocent-intent" defense, the exclusion of the evidence related to his "innocent-intent" defense, the partial denial of his *Brady* motion, and the substantive reasonableness of his sentence.

## II.

First, Baez argues that the district court erred in denying his motions to suppress the evidence found in the back room of the hotel suite, the evidence found in the safe in the Equinox, and the incriminating statements that he made while in custody. When considering the denial of a Fourth Amendment suppression motion, "we review the district court's conclusions of law *de novo* and its factual findings for clear error." *United States v. Molsbarger*, 551 F.3d 809, 811 (8th Cir. 2009).

### A.

We begin with Baez's challenges to the admission of the evidence found in the back room and in the safe in the Equinox.

### 1.

With limited exceptions, evidence acquired during, or as a consequence of, a search that violates the Fourth Amendment is inadmissible. *Utah v. Strieff*, 579 U.S. ---, 136 S. Ct. 2056, 2061 (2016). The two exceptions relevant here are the independent-source doctrine and the inevitable-discovery doctrine. Neither doctrine applies unless the evidence would have been acquired by lawful means had the unlawful search not occurred. *See Nix v. Williams*, 467 U.S. 431, 443-44 (1984) (explaining that neither doctrine puts the prosecution "in a better position than it

would have been in if no illegality had transpired").  The independent-source doctrine applies if the evidence both would have been acquired by lawful means had the unlawful search not occurred and in fact *was* acquired (or reacquired) by these lawful means.  The inevitable-discovery doctrine, on the other hand, applies if the evidence would have been acquired by lawful means had the unlawful search not occurred but in fact *was not* acquired (or reacquired) by these lawful means.  *See Murray v. United States*, 487 U.S. 533, 539 (1988) (noting that the inevitable-discovery doctrine applied in *Nix* because a lawful search "would have found" the evidence "had [the search] not been aborted" when the evidence was acquired unlawfully, but the independent-source doctrine would have applied "if the search had continued and had in fact found" the evidence).

Although the distinction between the independent-source and inevitable-discovery doctrines is not sharp, *see, e.g.*, *United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004) (expressing uncertainty regarding "which [doctrine] rules this case"), where exactly one draws the line between the two doctrines is unimportant.  Underlying both doctrines is the principle that, "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied."  *Murray*, 487 U.S. at 542; *see also Nix*, 467 U.S. at 443-44 (explaining that the point of both doctrines is to put the police "in the same . . . position that they would have been in if no police error or misconduct had occurred").  Provided that the evidence would have been acquired lawfully if the unlawful search had not occurred, admitting the evidence puts the government in the same position that it would have occupied if the unlawful search had not occurred.  This is true regardless whether the evidence in fact *was* (re)acquired lawfully—and thus whether the appropriate exception to invoke is the independent-source doctrine rather than the inevitable-discovery doctrine.  *See Murray*, 487 U.S. at 541-42 (explaining that admissibility does not turn on the "metaphysical" question whether it is possible for officers who retain evidence after seizing it unlawfully to "reseize[]" it lawfully).

One way for police to acquire evidence lawfully is pursuant to a valid search warrant. *See, e.g.*, *Horton v. California*, 496 U.S. 128, 139 (1990). To determine whether evidence within the scope of a valid warrant would have been acquired had a prior unlawful search not occurred, we ask whether (1) law enforcement "would have sought a warrant even if the [unlawful] search had not occurred," and (2) "the warrant was supported by probable cause even without information gained from the [unlawful] search." *Anguiano*, 934 F.3d at 874.

Here, the officers ultimately obtained a warrant to search the entire hotel suite and the Equinox. Crediting Officer Gruber's testimony, the district court found that the officers would have halted their search and sought a warrant had they thought that they lacked valid consent from Gavino to search the entire suite. *United States v. Anguiano*, No. 17-135(1) ADM/DTS, 2019 WL 2443540, at *5-6 (D. Minn. June 11, 2019). We affirmed this finding in *Anguiano*, 934 F.3d at 874, and we are bound by that precedent here, *see Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[O]ne panel is bound by the decision of a prior panel."). The district court also found that the warrant was supported by probable cause even without the information gained from the allegedly unlawful search of the back room. *United States v. Anguiano*, No. 17-135 ADM/DTS, 2017 WL 6501840, at *10 (D. Minn. Dec. 19, 2017). Again, we affirmed this finding in *Anguiano*, 934 F.3d at 875, and we are bound by that precedent here, *see Mader*, 654 F.3d at 800. Even assuming the initial search of the back room was unlawful, then, any evidence that fell within the scope of the warrant was admissible. And both the evidence found in the back room and the evidence found in the safe in the Equinox fell within the scope of the warrant. *See United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011) (explaining that a warrant to search a bedroom authorized a search of containers in the bedroom). Therefore, both the evidence found in the back room and the evidence found in the safe in the Equinox were admissible.

It is true that Baez is not bringing exactly the same challenge that Anguiano brought. Anguiano appealed only the admission of the evidence found in the armoire and the evidence found in the Equinox, which not only *would have been* but in fact

*were* acquired lawfully, during the later search. *See Anguiano*, 934 F.3d at 874. Here, Baez also challenges the evidence found under the sink. Because the officers had already uncovered this evidence during the earlier search, it is a stretch to say that it not only *would have been* but *was* (re)acquired lawfully. But this difference is relevant only to which doctrine accounts for the admissibility of the respective pieces of evidence. In *Anguiano*, we invoked the independent-source doctrine. *See id.* at 874-75. Here, at least with respect to the evidence found under the sink, the inevitable-discovery doctrine appears more appropriate. The bottom line is that, whichever doctrine applies, the evidence found under the sink, the evidence found in the armoire, and the evidence found in the Equinox (including the evidence found in the safe) were all admissible.

2.

Before considering Baez's objections to our analysis, we address whether our reliance on the inevitable-discovery doctrine is consistent with circuit precedent. We conclude that it is.

Our caselaw on the inevitable-discovery doctrine divides into two strands. The first strand aligns with the view that the Supreme Court has endorsed since *Nix*. On this view, in order for evidence acquired unlawfully and not reacquired lawfully to be admissible under the inevitable-discovery doctrine, it is sufficient that the evidence would have been acquired lawfully but for the constitutional violation. *See Nix*, 467 U.S. at 444 (holding that "evidence that would inevitably have been discovered" is admissible because excluding it would "put the government in a worse position" than "if no misconduct had taken place"); *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (reiterating that "a necessary . . . condition for suppression" is "that a constitutional violation was a 'but-for' cause of obtaining [the] evidence"). From our adoption of the inevitable-discovery doctrine in *United States v. Apker*, 705 F.2d 293 (8th Cir.), *rev'd in part on other grounds en banc*, 724 F.2d 633 (8th Cir. 1983), until our decision in *United States v. Conner*, 127 F.3d 663 (8th Cir. 1997), we articulated the doctrine in a way that is consistent with this view. *See,*

*e.g.*, *Apker*, 705 F.2d at 306 (holding that the inevitable-discovery doctrine "allows illegally obtained evidence to be admitted if it would have been discovered in the course of a proper investigation"); *United States v. Durant*, 730 F.2d 1180, 1185 (8th Cir. 1984) (holding that the inevitable-discovery doctrine applies "when the evidence would have been inevitably discovered absent the illegal conduct"); *Hamilton v. Nix*, 809 F.2d 463, 465-66 (8th Cir. 1987) (en banc) (explaining that evidence is admissible under the inevitable-discovery doctrine if "it inevitably would have been discovered by lawful means" and stating that "there is no reason to exclude . . . evidence" if "police misconduct is not even a 'but for' cause of its discovery"); *United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995) (quoting *Hamilton*).

In *Conner*, however, we held that the inevitable-discovery doctrine applies only if the government shows not only (1) "that the evidence would have been discovered by lawful means in the absence of police misconduct" but also (2) "that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." 127 F.3d at 667; *cf. United States v. Thomas*, 524 F.3d 855, 860-62 (8th Cir. 2008) (Colloton, J., concurring) (pointing out the differences between the Supreme Court's approach in *Nix* and our approach in *Conner*).

Since *Conner*, our practice has been inconsistent. In some cases, we have repeated *Conner*'s two-condition test. *See, e.g.*, *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998) (citing *Conner*); *Thomas*, 524 F.3d at 858 (citing *Glenn*); *United States v. Munoz*, 590 F.3d 916, 923 (8th Cir. 2010) (citing *Thomas*). In other cases, we have repeated the one-condition test from *Nix* and our earlier caselaw. *See, e.g.*, *United States v. Reinholz*, 245 F.3d 765, 779 (8th Cir. 2001) (citing Eighth Circuit caselaw prior to *Conner*); *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (citing *Nix*); *United States v. Sallis*, 920 F.3d 577, 582-83 (8th Cir. 2019) (citing *Nix*). In one case, we even applied the inevitable-discovery doctrine despite acknowledging that there was no contemporaneous alternative line of investigation. *See United States v. Chandler*, 197 F.3d 1198, 1201 (8th Cir. 1999).

The uncertainty in our caselaw regarding the inevitable-discovery doctrine does not stand in the way of our application of that doctrine here. We already explained in Section II.A.1 why the evidence found under the sink satisfies the test from *Nix* and our earlier caselaw. Therefore, our application of the inevitable-discovery doctrine here is proper unless *Conner*'s test is controlling. And even if *Conner*'s test is controlling, our application of the inevitable-discovery doctrine here is proper if *Conner*'s second condition is met. Because either possibility—that *Conner* is not controlling or that *Conner*'s second condition is met—would be sufficient to support our application of the inevitable-discovery doctrine here, we need not decide which is true. It is enough to conclude that at least one is true. And we know that at least one is true because, prior to *Conner*, we applied the inevitable-discovery doctrine in a case where it was less plausible than it is here that a contemporaneous alternative line of investigation was present.

That case is *Durant*, 730 F.2d 1180. In *Durant*, the defendant—charged with bank robbery—challenged the admission of evidence that he drove a blue Oldsmobile, which the police had acquired by unlawfully interrogating him while arresting him for an unrelated offense. *Id.* at 1184-85. The police did not realize the significance of the car until "[l]ater," "when [the defendant] was linked to the bank robbery." *Id.* We held that the evidence was admissible under the inevitable-discovery doctrine because, if the police had not known already that the defendant drove a blue Oldsmobile, then they would have found out by tracing the driver's license and traffic citation that they had obtained from the defendant when he was arrested. *Id.* at 1185.

It is more plausible that a contemporaneous alternative line of investigation was present here than in *Durant*. In *United States v. Hammons*, we held that it was enough to constitute "actively pursuing a substantial, alternative line of investigation" for officers to have in mind "an alternative plan" that they would have executed if the constitutional violation had not occurred. 152 F.3d 1025, 1030 (8th Cir. 1998). Here, Officer Gruber conceded that it did not "occur" to him "to go and . . . get a warrant" when he and the other officers arrived at the suite, and it was not

until he "found the meth" under the sink that he "wanted to get the warrant." But Officer Gruber also testified that he "understood that [getting a warrant] was an option" when he asked Gavino's consent to search the room, and he "would have . . . called for a search warrant" had Gavino refused to consent. This implies that Officer Gruber was at least disposed to execute an alternative plan if Gavino refused to consent, even if he did not consciously have such a plan in mind. In *Durant*, by contrast, the officers had no reason to suspect that the defendant had participated in a robbery involving a blue Oldsmobile when they arrested him. Hence, there is nothing to indicate that they were disposed to trace the driver's license and traffic citation in search of a blue Oldsmobile if the defendant refused to answer their questions—much less that they consciously had such a plan in mind. *See Durant*, 730 F.2d at 1185 ("[The defendant's] connection to the blue Oldsmobile would have been inevitably discovered *once the officers became aware of [his] alleged participation in the bank robbery*." (emphasis added)).

The fact that it is more plausible that a contemporaneous alternative line of investigation was present here than in *Durant* shows that either *Conner*'s second condition is met here or else *Conner* is not controlling. On the one hand, if a contemporaneous alternative line of investigation was present in *Durant*, then *a fortiori* a contemporaneous alternative line of investigation was present here, too. In that case, our application of the inevitable-discovery doctrine here would be proper because *Conner*'s second condition would be met. On the other hand, if a contemporaneous alternative line of investigation was not present in *Durant*, which applied the inevitable-discovery doctrine anyway, then *Conner*'s second condition conflicts with prior-panel precedent. In that case, our application of the inevitable-discovery doctrine here would be proper because *Conner* would not be controlling. *See Mader*, 654 F.3d at 800 (holding that, in the event of "conflicting panel opinions, the earliest opinion must be followed").[2] In sum, whether because *Conner*'s second

---

[2]Although Judge Colloton concluded in his *Thomas* concurrence that *Conner* was "governing precedent" despite his concerns with it, 524 F.3d at 862, we note that this remark was made before *Mader* was decided.

condition is met or because *Conner* is not controlling, circuit precedent supports our application of the inevitable-discovery doctrine here.

3.

Baez presents three additional objections to our analysis. First, he attacks the district court's basis for denying his motion to suppress the evidence found under the sink during the initial search of the back room. The district court held that Baez lacked standing to challenge the legality of the search because he had no reasonable expectation of privacy in the back room. Even assuming Baez is correct that he had a reasonable expectation of privacy in the back room, however, the alternative basis for denying his suppression motion that we have articulated stands. Because "we can affirm the district court's judgment on any ground that is supported by the record," *Taylor v. United States*, 204 F.3d 828, 829 (8th Cir. 2000), we need not reach the question whether Baez had a reasonable expectation of privacy in the back room.

Second, Baez disputes that the warrant would have been supported by probable cause even if the initial search of the back room had not occurred. According to Baez, "the methamphetamine found under the sink was included in the warrant [application] and most certainly influenced the judge's decision [to issue the warrant]." We settled this dispute in *Anguiano*, where we recounted at length the evidence that "justified issuance of a warrant." 934 F.3d at 875. Our conclusion there, that "probable cause [supported] issuance of the search warrant even without information gleaned from the initial search" of the back room, *id.*, is binding here. *See Mader*, 654 F.3d at 800.

Third, Baez argues that "the search [of the safe in the Equinox] was legal as to Anguiano but illegal as to Baez" because "the facts supporting probable cause for the warrant had nothing to do with Baez or his property and everything to do with Anguiano." But the legality of a search pursuant to a valid warrant is not suspect-specific. *See, e.g., Darr*, 661 F.3d at 379 ("Because the . . . warrant authorized the

-11-

search of the entire premises . . . , officers did not exceed its scope by searching [the defendant's] bedroom, even though the warrant was issued based on information about activities of [the defendant's father].").  Here, the warrant authorized the search of the entire Equinox, including containers inside it.  This rendered the search of the safe legal without qualification, not merely "legal as to Anguiano."  Evidence from the search was therefore admissible not only against Anguiano but also against Baez.

B.

We now turn to Baez's challenge to the district court's denial of his motion to suppress the incriminating statements that he made while in custody.  With limited exceptions, evidence acquired as a consequence of an arrest that violates the Fourth Amendment is inadmissible.  *See Strieff*, 136 S. Ct. at 2061.  Baez argues that his incriminating statements were acquired as a consequence of his unlawful arrest and that none of the exceptions to the exclusionary rule applies.

Whether Baez's warrantless arrest was lawful depends on whether the officers had probable cause to believe that he had committed a crime.  *See, e.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  In *Maryland v. Pringle*, the Supreme Court held that officers have probable cause to believe that everyone present in a car in which drug trafficking was occurring was involved.  540 U.S. 366, 373-74 (2003).  As the Court pointed out, it "would be unlikely" for anyone involved in drug trafficking "to admit an innocent person with the potential to furnish evidence against him" into the "relatively small" confines of a car.  *Id.* at 373.  In *United States v. Romero*, the Sixth Circuit extended this reasoning to hotel rooms.  452 F.3d 610, 618 (6th Cir. 2006).  "Like the enclosed space of the automobile in which the individuals were arrested in *Pringle*," the court reasoned, "the relatively small and confined space of the hotel room supports the conclusion that it was reasonable for the officers to infer . . . that [everyone in the room] was involved in a common illegal-drug enterprise."  *Id.*

-12-

Until today, we have not had occasion to join the Sixth Circuit in extending *Pringle* to hotel rooms or suites. In *United States v. Cowan*, however, we cited *Romero* when extending *Pringle* to apartments. *See* 674 F.3d 947, 954 (8th Cir. 2012) ("As with the car in *Pringle* and the hotel room in *Romero*, the officers had probable cause to believe [the defendant], who was present in the apartment, was engaged in a common drug trafficking enterprise with the apartment's occupants."). A hotel suite is comparable to an apartment. Therefore, both *Cowan*'s reasoning and its citation to *Romero* support the proposition that officers have probable cause to believe that everyone present in a hotel suite in which drug trafficking was occurring was involved.

Here, Baez was present in a hotel suite in which the police had probable cause to believe that drug trafficking was occurring. Even setting aside the evidence found in the back room, which Baez claims was inadmissible, *but see supra* Section II.A, the front room contained a methamphetamine pipe and keys to a car in which a canine unit had indicated drugs were present. In addition, the suite was reserved under the name of someone who had just been stopped in a car with a fake DEA badge, dryer sheets, numerous credit cards in different names, and large wads of cash. We conclude that the police had probable cause to believe that everyone present in the hotel suite, including Baez, was involved in drug trafficking.

Because the officers had probable cause to believe that Baez had committed a crime, Baez's arrest was lawful. Therefore, the district court did not err in denying Baez's motion to suppress the incriminating statements that he made while in custody.

## III.

Next, Baez argues that the district court erred in failing to instruct the jury that it would "negate[] the specific intent required by the charges" if Baez participated in the drug-trafficking conspiracy with the intent to "assist ongoing federal investigations" and in the good-faith, even if unreasonable, belief that "his actions

-13-

were not criminal." "We review jury instructions for an abuse of discretion." *United States v. Ghant*, 339 F.3d 660, 664 (8th Cir. 2003).

As the Government points out, the "innocent-intent" instruction that Baez demanded misstates the law. An intention to assist law enforcement is not a defense to a criminal charge. *See, e.g.*, *United States v. Kabat*, 797 F.2d 580, 589 (8th Cir. 1986) (affirming a jury instruction to disregard the defendants' further intentions or "motive[s], good or bad," "laudable or not," if the prosecution "established beyond a reasonable doubt the essential elements of each offense" (emphasis omitted)). Likewise, "the usual rule [is] that ignorance of the law is no defense to a criminal charge." *United States v. Lalley*, 257 F.3d 751, 755 (8th Cir. 2001). Although the Supreme Court has "carv[ed] out an exception to [this] rule" for "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct," *Bryan v. United States*, 524 U.S. 184, 194-95 (1998), the crimes with which Baez was charged do not fall within this exception, *see McFadden v. United States*, 576 U.S. 186, 192 (2015) ("Take, for example, a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules. Because ignorance of the law is typically no defense to criminal prosecution, this defendant would . . . be guilty of knowingly distributing a controlled substance." (internal quotation marks and citations omitted)).

Therefore, even if Baez intended to assist law enforcement and believed that "his actions were not criminal," that would not negate his mens rea. The district court did not abuse its discretion in declining to instruct the jury otherwise. *See United States v. McQuarry*, 726 F.2d 401, 402 (8th Cir. 1984) (concluding that the district court did not abuse its discretion in declining to give a legally "unsupported" jury instruction).

## IV.

Next, Baez challenges the district court's exclusion of evidence related to the "innocent-intent" theory behind his proposed jury instruction. "We review

evidentiary rulings for abuse of discretion."  *United States v. Gustafson*, 528 F.3d 587, 590 (8th Cir. 2008).

Under the Federal Rules of Evidence, evidence is admissible only if it is relevant.  Fed. R. Evid. 402.  Evidence is relevant if and only if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Even if evidence is relevant, the trial court "may exclude [it] if its probative value is substantially outweighed by a danger of," *inter alia*, "confusing the issues" or "misleading the jury."  Fed. R. Evid. 403.

Here, the evidence that Baez sought to admit was inadmissible under Rule 402 because it was irrelevant.  The evidence falls into two categories:  (1) evidence regarding an individual who asked Baez to translate at a meeting with a federal agent where the individual proposed serving as an informant on drug activities in North Carolina; and (2) evidence regarding Baez's mental health.  Baez claims that both sets of evidence are relevant insofar as they support his "innocent-intent" defense: (1) the evidence regarding the potential informant because it tends to show that Baez intended to assist in a federal investigation; and (2) the evidence regarding Baez's mental health because it explains how he could believe in good faith that his actions were assisting law enforcement and were not criminal.  As explained above, however, Baez's alleged further intentions and ignorance of the law are of no consequence in determining his guilt.  *See supra* Part III.  Therefore, neither set of evidence is relevant under Rule 401, which means that neither is admissible under Rule 402.

Furthermore, even if the evidence had been relevant, the district court was within its discretion to exclude it under Rule 403 because the risk that it would confuse issues or mislead the jury substantially outweighed whatever slight probative value it may have had.  Testimony regarding a potential informant's activities in North Carolina would have distracted from the events in Minnesota for which the Government was prosecuting Baez, and evidence of Baez's mental health

may have caused the jury to confuse Baez's "innocent-intent" defense with an insanity defense. Therefore, even if the evidence had been admissible under Rule 402, the court was within its discretion to exclude it under Rule 403. *See United States v. Hillsberg*, 812 F.2d 328, 333 (7th Cir. 1987) (affirming the exclusion of evidence related to the defendant's mental state under Fed. R. Evid. 403 on the ground that it "could have improperly brought the insanity issue in through the back door").

We conclude that the district court did not abuse its discretion in excluding evidence regarding the potential informant in North Carolina and Baez's mental health.

## V.

Next, Baez challenges the district court's partial denial of his motion to compel the Government to disclose putative *Brady* material regarding the potential informant in North Carolina after *in camera* review. We review the denial of a motion to compel disclosure of *Brady* material after *in camera* review for abuse of discretion. *United States v. Pendleton*, 832 F.3d 934, 941-42 (8th Cir. 2016).

Under *Brady*, "[t]he government has an obligation to disclose evidence that is favorable to the accused and material to either guilt or punishment." *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009). Evidence favorable to the defendant includes not only exculpatory evidence but also evidence that tends to impeach government witnesses. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence," but whether "its absence . . . undermines confidence in the outcome of the trial." *Id.* at 434.

Here, the district court ordered the disclosure of what little of the evidence was arguably favorable to Baez. Having reviewed the remainder of the evidence, we agree with the district court that *Brady* did not require its disclosure. It was not exculpatory, and it did not tend to impeach a Government witness. Therefore, it was not even favorable to Baez, let alone material in the sense that its nondisclosure undermines confidence in the outcome of the trial.

We conclude that the district court did not abuse its discretion in partially denying Baez's motion to compel disclosure of evidence regarding the potential informant in North Carolina.

## VI.

Finally, Baez argues that he is entitled to resentencing because his sentence is substantively unreasonable. "We review the substantive reasonableness of a sentence under [a] deferential abuse-of-discretion standard." *United States v. Lazarski*, 560 F.3d 731, 733 (8th Cir. 2009). Where a sentencing court varied downward from the guidelines, "it is nearly inconceivable that the court abused its discretion in not varying downward still further." *Id.*

Here, the district court varied downward from the guidelines by more than fifty percent. Baez claims that the sentence was nonetheless substantively unreasonable because it was higher than the sentences imposed on Baez's coconspirators. *See United States v. Fry*, 792 F.3d 884, 892-93 (8th Cir. 2015) (treating objections to sentencing disparities among coconspirators as substantive-reasonableness challenges). But "the statutory direction to avoid unwarranted sentence disparities, *see* 18 U.S.C. § 3553(a)(6), refers to *national* disparities, not differences among co-conspirators." *Id.* at 892. By itself, the fact that "a similarly situated co-conspirator was sentenced differently" provides "no principled basis for an appellate court to say which defendant received the 'appropriate' sentence." *Id.* at 893. Moreover, Baez was not similarly situated to his coconspirators; for example, he was the only one not to plead guilty. Consequently, the disparity

-17-

between his sentence and theirs was not unreasonable. *See id.* (explaining that "disparate sentences among *dis*similar defendants," such as those who "pleaded guilty and accepted responsibility" and those who did not, "are not unwarranted"). This is not the "nearly inconceivable" case in which a district court that varied downward from the guidelines nonetheless "abused its discretion in not varying downward still further." *See Lazarski*, 560 F.3d at 733.[3]

## VII.

For the foregoing reasons, we affirm.

LOKEN, Circuit Judge, concurs in the judgment and joins the opinion except Section II.A.2.

———————————————————

---

[3]To the extent that Baez means to suggest that the district court failed to give adequate consideration to § 3553(a)(6), he is raising a claim of procedural error that we review by asking whether it is "clear from the record that the district court actually considered [§ 3553(a)(6)] in determining the sentence." *United States v. Salazar-Aleman*, 741 F.3d 878, 881 (8th Cir. 2013). Here, it is clear from the record that the district court considered § 3553(a)(6) because the district court explicitly cited § 3553(a)(6) in its explanation for its downward variance. Therefore, to the extent that Baez means to argue that the district court committed procedural error by failing to consider § 3553(a)(6), his claim fails.